## CROWN CORK & SEAL CO. *v.* FERDINAND GUT-MANN CO.

No. 72.   Argued December 13, 1937.—Decided May 2, 1938.

Mr. John J. Darby, with whom Mr. Thomas G. Haight was on the brief, for petitioner.

Mr. William E. Warland, with whom Mr. Nathaniel L. Leek was on the brief, for respondent.

MR. JUSTICE BUTLER delivered the opinion of the Court.

Petitioner sued respondent in the district court for eastern New York to enjoin infringements of patents, two of which are here involved. One is Warth Reissue Patent, No. 19,117, dated March 20, 1934. The other is Warth Patent, No. 1,967,195, dated July 17, 1934, a divisional patent. Both relate to methods for applying small disks of paper or foil, known as center spots, to cork cushions of crown caps. These caps are used to seal bottles containing pressure beverages. The center spot prevents contact of the liquid with the cork. The district court adjudged both patents valid and infringed. 14 F. Supp. 255. The circuit court of appeals reversed, holding the reissue patent not infringed and the divisional one invalid because of laches in filing the application on which it was granted. 86 F. (2d) 698.

The questions presented by the petition for the writ, granted 302 U. S. 664, are these:

1. "Does this Court's decision in *Webster Co.* v. *Splitdorf Co.* [264 U. S. 463] mean that, even in the absence of intervening adverse rights, an excuse must be shown for a lapse of more than two years in presenting claims in

a divisional application regularly filed and prosecuted in accordance with patent office rules?"

2. "Where there has been more than two years delay in asserting specific claims in a divisional application, is it an excuse for the delay that there were claims in the parent patent which, on their face, covered and were reasonably believed to cover, the subject-matter of the divisional claims, even if a Court later interpreted the parent patent claims not to cover such subject-matter?"

Our consideration of the case will be limited to these questions. *Washington Coach Co.* v. *Labor Board,* 301 U. S. 142, 146. *Morehead* v. *N. Y. ex rel. Tipaldo,* 298 U. S. 587, 604, 605. *Clark* v. *Williard,* 294 U. S. 211, 216. *Alice State Bank* v. *Houston Pasture Co.,* 247 U. S. 240, 242. The first calls for decision upon a single point. It specifically assumes the absence of intervening rights and that the application was appropriately made. There is no question as to the validity of either the original or reissue patents.

Warth filed his first application January 7, 1927, and his second November 7, 1930.[1] From these came the original patent, January 6, 1931. It was to correct an error in the specification that the reissue patent was granted. Before issue of the original patent Johnson, November 26, 1929, filed application on which a patent issued April 5, 1932. April 4, 1933, two years and three months after the original patent was granted Warth, he carved from his second application a divisional one in which he copied the claims of the Johnson patent. In the interference declared upon the conflict, the patent office held Warth's

---

[1] The first application extended to materials to be used in making center spots as well as to methods for applying them. The second application, because of a requirement of the patent office, omitted disclosures as to materials but included those as to methods that the first contained.

divisional application entitled to the filing date of his first one, and awarded the claims of the Johnson patent to him as prior inventor. These are the claims held too late by the circuit court of appeals.

The claims of the reissue patent involved are shown in the margin.[2] The important feature is simultaneous application of pressure and heat to the center spot to make it stick to the cork cushion in the cap. Neither these nor any other claims of the patent specify means to be employed to furnish the heat. The claims in suit of the divisional patent [3] cover means to supply heat to be ap-

---

[2] Claim 1. "The improved method of manufacturing caps of the type having an interior disc of cushion material provided on its exposed face with a center spot, which comprises providing spot material in strip form having one surface formed of an exposed continuous coating of water resistant adhesive which is normally hard at room temperature but becomes tacky upon the application of heat and having another surface to be exposed to the contents of a capped container, cutting from said strip a facing spot having one surface completely coated with said adhesive with a cap disposed beneath the portion of the strip from which the spot is cut, whereby the cutting operation positions the spot upon the cushion material with the coating between the spot and the cushion material, and, upon assembly applying simultaneously to the spot pressure and sufficient heat to render the adhesive tacky, thereby causing the spot to adhere to the cushion material, and thereafter permitting the adhesive to cool and harden."

Claim 3 repeats the words of claim 1 and adds these words, "while subjecting the assembled unit to pressure."

[3] These claims are fully indicated immediately below. The insertions in brackets give equivalent terms used in the claims of the Reissue patent.

Claim 1. "The method of assembling linings [center spots] for sealing pads [cushion material] in receptacle closure caps, consisting in providing caps with sealing pads therein and a web of lining material arranged with an adhesive surface non-viscous at normal temperature, heating the pads in the caps, severing linings from the web of lining material and assembling the linings as they are severed from the web in the caps with the adhesive surface

plied to the center spots when subjected to pressure. The important feature is "heating the pads [cork cushions] in the caps" before placing the spots upon them.

The first application, January 7, 1927, stated: "It may be desirable to secure the metal foil spot in position, prior to the heat and pressure steps, sufficiently to prevent dislodgement of the spot during any interval between assembling and final sticking. This may be accomplished, for example, by preheating the assembled crown, to soften the coating as soon as the metal foil spot is deposited." That application contained claims, construed by the circuit court of appeals to be broad enough to cover that disclosure. The patent office called for drawings to illustrate means for carrying out the method claimed. Accordingly, Warth showed, by way of illustration, that heat might be furnished by the punch used to cut the spots from the adhesive material and place them upon the cork in the cap, where by the same stroke of the plunger, they might be subjected to pressure. When he filed the drawings, December 3, 1930, he canceled from the first application the statement just quoted and canceled the claims originally filed. The second application had already been filed. Both contained another statement: "In carrying out the invention according to what is now considered the best practice, the coating will be softened by heat after the crown is assembled. This may be accomplished in any suitable manner, as by a heated plunger or a plunger and heated table. The heat softens

---

in contact with the heated pads to render the adhesive viscous and effect adhesion of the linings to the pads.'

Claim 2 repeats the words of claim 1 and adds these words, "and then placing the linings in the caps under heat and pressure to effect an intimate adhesion between the linings and pads."

Claim 3 repeats the words of claim 1 and the addition of claim 2 and adds these words, "and then placing the linings assembled in the caps under pressure during the cooling thereof."

the coating and renders it adhesive. ... ." So far as concerns the question under consideration, it is broad enough to include means for supplying heat by the punch as shown by the drawings, and the preheating method claimed in the divisional application.

The district court found no adverse use of the preheating method prior to the filing date of the application for the reissue patent. The circuit court of appeals did not disturb that finding. It found that Warth's disclosure of the preheating method was continuously before the patent office from the date of his first application, but that there was no claim for the preheating method on file from December 3, 1930, until April 4, 1933, when he filed application for the divisional patent. It held, citing *Webster Co. v. Splitdorf Co., supra,* that *prima facie* the two year limit applies to divisional applications, and that an applicant who waits longer before claiming an invention disclosed in his patent must justify his delay by proof of some excuse. It said, 86 F. (2d) 702, "No such excuse appears here. Had Warth chosen to retain in his parent application broad generic claims which might cover the preheating method, then indeed the Splitdorf rule might not be applicable . . . But . . . for a period of more than two years Warth apparently did not wish to claim the preheating method, having deliberately canceled the preheating specification from his original application and shaped his claims so as to exclude it and his patent having been granted January 6, 1931. He made no claim for preheating until more than two years thereafter, namely, April 4, 1933. In the meantime a patent containing claims for the preheating method had been granted to Johnson on April 5, 1932, and it was Warth's discovery of this fact which stirred him to action. As in the *Splitdorf* case, had it not been for this competitor, Warth might never have considered the subject worth claiming as an invention." The court meant that Warth had really abandoned his inven-

tion. See *Western Electric Co.* v. *General Talking Pictures Co.*, 91 F. (2d) 922, 927.

But, as abandonment was not pleaded as a defense, R. S. § 4920, and as Warth's disclosure was continuously before the patent office, clearly without any significance adverse to the petitioner is the fact that Warth formally canceled one disclosure from his first application and with it claims thought by the circuit court of appeals broad enough to cover the disclosure. The continuity so maintained shows that Warth intended to retain, not to abandon, the disclosed invention. See *Godfrey* v. *Eames*, 1 Wall. 317, 325–326. *Clark Blade & Razor Co.* v. *Gillette Safety Razor Co.*, 194 Fed. 421, 422.

This case is not like *Webster Co.* v. *Splitdorf Co.*, *supra*. In that case, there came here the question of the validity of claims of a patent issued to Kane in 1918. In 1910 Kane had filed his first application, on which patent issued in 1916. In 1913 a patent covering the same subject-matter issued to the Podlesaks, to whom a reissue patent was granted in 1915. Later in 1915, Kane filed a divisional application which copied the claims of the Podlesak patent. They were decided in favor of the Podlesaks. Thereafter, June 17, 1918, Kane amended his divisional application by adding claims which were allowed, and September 24, 1918, patent issued to Webster Electric Company, Kane's assignee. In 1915, it had brought the suit against the Splitdorf Company. October 25, 1918, it filed a supplemental bill bringing in claims of the patent issued September 24, 1918.

This Court pointed out (p. 465) that the claims in question "were for the first time presented to the Patent Office, by an amendment to a divisional application eight years and four months after the filing of the original application, five years after the date of the original Podlesak patent, disclosing the subject matter, and three years after the commencement of the present suit." We sug-

gested that it was doubtful whether the claims were not so enlarged as to preclude allowance under the original application; we found that Kane, deeming their subject-matter not invention, did not intend to assert them, and, prior to 1918, did not entertain an intention to have them covered by patent. During all of this time their subject matter was disclosed and in general use; Kane and his assignee simply stood by and awaited developments. It was upon the reasons so stated that this Court declared (p. 466) "We have no hestitation in saying that the delay was unreasonable, and, under the circumstances shown by the record, constitutes laches, by which the petitioner lost whatever rights it might otherwise have been entitled to."

Upon a review of earlier cases we condemned the lower court's statement (283 Fed. 83, 93) that *Chapman* v. *Wintroath*, 252 U. S. 126, fixed the time within which application for a divisional patent might be made at two years from date of the issue of the parent patent. We showed that the *Chapman* case held that an inventor, whose application disclosed but did not claim an invention later patented to another, was not required within one year after issue of the other patent, to file divisional application claiming the invention and so to raise issue of interference, but that, by analogy, the two-year period under R. S. § 4886 [4] applied rather than the one-year

---

[4] R. S. § 4886, as amended March 3, 1897 (29 Stat. 692): "Any person who has invented or discovered any new and useful art, machine, manufacture, or composition of matter, or any new and useful improvements thereof, not known or used by others in this country, before his invention or discovery thereof, and not patented or described in any printed publication in this or any foreign country, before his invention or discovery thereof, or more than two years prior to his application, and not in public use or on sale in this country for more than two years prior to his application, unless the same is proved to have been abandoned, may, upon payment of the fees required by law, and other due proceeding had, obtain

period of R. S. § 4894,[5] and that the opinion did not fix a hard and fast rule to be applied in every case of a divisional application. Then we said (p. 471): "Our conclusion, therefore, is that, in cases involving laches, equitable estoppel, or intervening private or public rights, the two-year time limit *prima facie* applies to divisional applications, and can only be avoided by proof of special circumstances justifying a longer delay. In other words, we follow in that respect the analogy furnished by the patent reissue cases." That statement is not directly applicable to the precise question of laches upon which the case turned, but was made in reference to the question arising upon the lower court's erroneous interpretation of *Chapman* v. *Wintroath*. See *Wagenhorst* v. *Hydraulic Steel Co.*, 27 F. (2d) 27, 29–30. *Wirebounds Patents Co.* v. *Saranac Corp.*, 37 F. (2d) 830, 840–841. *Utah Radio Products Co.* v. *Boudette*, 78 F. (2d) 793, 799. It is clear that, in the absence of intervening adverse rights, the decision in *Webster Co.* v. *Splitdorf Co.* does not mean that an excuse must be shown for a lapse

a patent therefor." [The statute has since been amended, but not to change the two-year period. See 35 U. S. C. § 31.]

Cf. R. S. § 4887 (35 U. S. C. § 32), relating to inventions patented abroad; R. S. § 4897 (35 U. S. C. § 38), relating to renewal application after failure to comply with requirement as to payment of final fee; R. S. § 4920 (35 U. S. C. § 69), relating to defense of prior invention.

[5] R. S. § 4894, as amended March 3, 1897 (29 Stat. 693). "All applications for patents shall be completed and prepared for examination within one year after the filing of the application, and in default thereof, or upon failure of the applicant to prosecute the same within one year after any action therein, of which notice shall have been given to the applicant, they shall be regarded as abandoned by the parties thereto, unless it be shown to the satisfaction of the Commissioner of Patents that such delay was unavoidable." [The statute has since been amended to reduce the period to six months. See 35 U. S. C. § 37.]

of more than two years in presenting the divisional application. Where there is no abandonment, mere delay in filing a divisional application for not more than two years after an intervening patent or publication, does not operate to enlarge the patent monopoly beyond that contemplated by the statute. By R. S. § 4886, delay in filing an application for not more than two years after an intervening patent or publication does not bar a patent unless the invention "is proved to have been abandoned." See *Wirebounds Patents Co.* v. *Saranac Corp.,* 37 F. (2d) 830, 840, 841; 65 F. (2d) 904, 905, 906. And, as none need be shown, there is no occasion to decide whether the facts stated in the second question are sufficient to constitute an excuse for the delay referred to.

As our decision is limited to the first question presented, the judgment of the circuit court of appeals will be reversed and the case will be remanded to that court for decision of the other issues in the case in accordance with this opinion.

*Reversed.*

Mr. Justice Cardozo and Mr. Justice Reed took no part in the consideration or decision of this case.

Mr. Justice Black, dissenting.

This Court declared in *Webster Co.* v. *Splitdorf Co.,* 264 U. S. 463, 466, 471:

"In suits to enforce reissue patents, the settled rule of this Court is that a delay for two years or more will 'invalidate the reissue, *unless the delay is accounted for and excused by special circumstances, which show it to have been not unreasonable.*' . . .

"Our conclusion, therefore, is that in cases involving *laches, equitable estoppel or intervening private or public rights,* the two-year limit *prima facie applies to divisional applications* and can only be avoided *by proof of special*

*circumstances justifying a longer delay.* In other words, we follow in that respect the analogy furnished by the patent reissue cases." (Italics supplied.)

The rule announced in the *Splitdorf* case was based upon a long line of decisions of this Court extending from *Miller* v. *Brass Co.*, 104 U. S. 350, decided in 1882.

The majority opinion abandons the principle of the *Splitdorf* case that either laches *or* equitable estoppel *or* intervening private rights *or* intervening public rights—in the absence of *proved special circumstances*—bars a divisional patent after a lapse of an unreasonable length of time—*prima facie* two years. It is now held that neither laches nor equitable estoppel may alone invalidate a patent without proof of "intervening adverse rights." The authorities relied on in the *Splitdorf* case emphasized the right of the public—apart from provable adverse use by individuals—to require an applicant to pursue his right to a patent diligently and without enlargement of claims *after filing an original application.*[1] "Any practice by the inventor and applicant for a patent through which he deliberately and without excuse postpones beyond the date of the actual invention, the beginning of the term of monopoly, and thus puts off the free public enjoyment of the useful invention, is an evasion of the statute and defeats its benevolent aim." [2]

There is a further departure from the *Splitdorf* case in the holding that two years delay in filing a divisional application after an intervening patent does not—*in the absence of actual abandonment of the invention*—bar the right to a "divisional" patent. Abandonment is but one of many grounds for invalidating a patent. Equitable

---

[1] See, *Miller* v. *Brass Co.*, 104 U. S. 350, 355; *James* v. *Campbell*, 104 U. S. 356, 371; *Mahn* v. *Harwood*, 112 U. S. 354, 360; *Ives* v. *Sargent*, 119 U. S. 652, 662; *Topliff* v. *Topliff*, 145 U. S. 156, 170, 171; *Wollensak* v. *Sargent & Co.*, 151 U. S. 221, 228.

[2] *Woodbridge* v. *United States*, 263 U. S. 50, 56

estoppel, intervening public rights, or unjustified and unexplained laches were considered in the *Splitdorf* case and cases there relied on to be individually sufficient bars, without proof of abandonment. Unjustified delay and abandonment are separate defenses. If proof of abandonment is to be a prerequisite, laches as a separate defense is destroyed, although it has been recognized for more than fifty years. Unreasonable delay which serves to postpone the beginning of the seventeen year monopoly limitation, not only is possible without abandonment of the invention, but is highly probable. With the destruction of the defense of laches the public loses the benefit of the principle that "An inventor *cannot without cause* hold his application pending during a long period of years, leaving the public uncertain, whether he intends ever to prosecute it, and keeping the field of his invention closed against other inventions." [3]

The Court of Appeals following this settled principle—now abandoned—said: [4] "We think they [claims in the patent] are invalid for *laches in filing the application for them*. [Citing *Webster Co.* v. *Splitdorf Co.*]. . . . These circumstances [facts of this case] invite operation of the two-year limitation designed to protect the public against obtaining in effect an extension of a patentee's monopoly *by apathy and unexcused delay* in bringing forward by divisional or reissue applications claims broader than those originally sought." (Italics supplied.)

While "divisional" applications have never been expressly authorized by statute the courts have long recognized their use as a part of Patent Office procedure. Petitioner's patent which the Court of Appeals found barred by laches was granted on a "divisional" application. Patent Office regulations which have limited each application for a patent to a single invention and have re-

---

[3] *Planing-Machine Co.* v. *Keith,* 101 U. S. 479, 485.

[4] 86 F. (2d) 698, 702.

quired a "division" of an application containing claims for two separate and distinct inventions, apparently gave rise to the procedural device of "divisional applications." The Court of Appeals of the District of Columbia acting in a special appellate capacity[5] and the Patent Office, have treated a "divisional," properly used, in some respects, as a substitute for an amendment. In accordance with this conception "divisionals" have been for certain purposes, treated as "continuations" of original applications and given the priority of original applications. The logical conclusion was reached that after an original application merged in a patent, a "divisional" application could not be attached to, or considered as a "continuation" of it, because "there was nothing to be continued."[6] After a patent is granted it passes "beyond the control and jurisdiction" of the Patent Office; the proceedings are closed and the application can neither be amended nor serve as the basis for a new "divisional" or "continuing" application.[7]

Here an application for a process patent was filed in 1927. November, 1930, in response to Patent Office re-

[5] *Frasch* v. *Moore,* 211 U. S. 1, 9, 10; *Butterworth* v. *Hoe,* 112 U. S. 50, 60.

[6] *In re Spitteler,* 31 App. D. C. 271, 274, 275. ". . . 'it is well established that for one application to be a division, within the meaning of the law, of another, the two must at some time be co-pending,' . . . *Sarfert* v. *Meyer,* 1902 C. D. 30; *In re Spitteler,* 31 App. D. C. 271, 1908 C. D. 374; . . . *Wainwright* v. *Parker,* 32 App. D. C. 431, 1909 C. D. 379. . . .

". . . An application cannot be considered as a continuance of a patent granted prior to the filing thereof, since after the application has eventuated into a patent there is nothing left pending before the Patent Office upon which it could act or to which the later application could attach. *In re Spitteler,* 31 App. D. C. 271, 134 O. G. 1301; *Wainwright* v. *Parker,* 32 App. D. C. 431, 142 O. G. 1115, 1909 C. D. 379." *Fessenden* v. *Wilson,* 48 F. (2d) 422, 424.

[7] See, *McCormick Machine Co.* v. *Aultman,* 169 U. S. 606, 608, 609.

quirement, a "divisional" application was filed for a *product* patent. January, 1931, a process patent was granted on the original application. More than two years after the original application had merged into a process patent another application designated as a "divisional" was filed (April 4, 1933), for a second process patent— here involved. The Court of Appeals found this delay of six years to be without justification or excuse. Disregarding the previously recognized requirement that justification and excuse must be proven for such delay, the majority now hold that an applicant can, for six years, delay his claim for an alleged discovery without excuse, justification, or reason for the delay. This is permitted despite the fact that unclaimed disclosure of the alleged invention had been made in the 1927 process application and in the 1930 product application.

Congress—given the power by the Constitution—has fixed the statutory limit of a patent monopoly at seventeen years.[8] By the procedural device of a "divisional" application, designed to protect rights granted an inventor by statute, petitioner has carved for itself priority monopoly rights, beginning in 1927 and lasting until 1951— twenty-four years, or seven years more than Congress has authorized.

In the remedy of reissue provided by statute for applicants whose claims fail to protect their entire discoveries,[9] Congress has been alert to protect the public from such an extension of monopoly. A reissue patent must be based on oath that an applicant's original patent failed to cover its actual invention as a result of accident, inadvertence or mistake, and runs only *for the unexpired portion of a seventeen year patent grant.* The use of "divisionals" or "continuations," no longer subject to the defense of laches

[8] 35 U. S. C., c. 2, § 40.
[9] 35 U. S. C., c. 2, § 64.

or unreasonable delay, will permit an applicant to obtain, by a nonstatutory procedural device, monopoly privileges denied by the reissue statute.

The essential additional claim in petitioner's 1934 "divisional" patent was only mentioned in the 1927 original application and the 1930 "divisional" application by way of casual suggestion and incidental illustration.[10] Even this casual suggestion was stricken from the 1927 application in December, 1930. These suggestive illustrations did not constitute parts of the inventions which the 1927 and 1930 applications sought to cover or secure.[11] The speculative suggestions—from separate applications for different inventions—are pieced together and held sufficient to "continue" the 1927 application (after its merger in a patent) and the 1930 application, as support for the retroactive operation of a claim made for the first time in

---

[10] The essential additional claim of the 1934 divisional process patent was for "preheating" cork used in making bottle caps. The incidental reference to preheating in the 1927 application was as follows:.

"It *may* be *desirable* to secure the metal foil spot in position, prior to the heat and pressure steps, sufficiently to prevent dislodgment of the spot during any interval between assembling and final sticking. This *may be accomplished, for example,* by preheating the assembled crown, to soften the coating as soon as the metal foil spot is deposited. Or the coating *may be softened* by moistening slightly with a solvent, such as benzol. In either case the coating becomes tacky enough to hold the metal foil from getting out of position during ordinary passage through assembling apparatus."

The 1930 divisional application for a product patent merely suggested that *"It may be desirable* to secure the spot in position, prior to the heat and pressure steps, sufficiently to prevent dislodgement of the spot during any interval between assembling and final sticking. *This may be accomplished,* for example, by preheating the assembled crown, to soften the coating, as soon as the metal foil is deposited." (Italics supplied.)

[11] Cf., *Corbin Cabinet Lock Co.* v. *Eagle Lock Co.*, 150 U. S. 38, 42, 43.

174

1933. As a result of the destruction of the defense of laches in applying for "divisional" applications, those familiar with a given field of industry may now insert speculative conjectures as disclosures in various applications and permit them to lie dormant until a competitor reduces speculation to practicality. Then, by the device of a "divisional," or if need be, as here, by "divisional" on "divisional," such a competitor can be pursued with infringement suits and harassed into surrendering his business to an ingeniously dilatory applicant.[12] Thus, sweeping, indefinite and unclaimed disclosures, and adroit use of "divisionals"—which laches and unreasonable delay are no longer sufficient to bar—are permitted to extend a patent's statutory life and to increase a patentee's reward beyond that granted by Congress.

." 'The patent laws are founded in a large public policy to promote the progress of science and the useful arts. The public, therefore, is a most material party to, and should be duly considered in, every application for a patent. . . . But the arts and sciences will certainly not be promoted by giving encouragement to inventors. to withhold and conceal their inventions for an indefinite time, or to a time when they may use and apply their inventions to their own exclusive advantage, irrespective of the public benefit, and certainly not if the inventor is allowed to conceal his invention to be brought forward in some after time to thwart and defeat a more diligent and active inventor, who has placed the benefit of his invention within the reach and knowledge of the public.' "[13]

[12] Cf., *Atlantic Works* v. *Brady,* 107 U. S. 192, 200.

[13] *Woodbridge* v. *United States, supra,* 61.