PROGRESSIVE GAMES, INC.
a Delaware corporation,
Plaintiff,

v.

AMUSEMENTS EXTRA, INC.; Marcel Huard; BDC Mecanique Distribution a/k/a ABCE Electro–Mecanique Ltee.; Distribution, Equipments, Qualite de Casinos Ltee. n/k/a Megapro; Jean–Marc Guimont; Linda Bouchard; Distribution Equipments Qualite de Casinos Ltee.; Marcel Guillemette; Futek–MSM Patents Ltd.; Charles Bergeron; Diversion Extra de Quebec S.A., Defendants.

No. 97–WY–2689–CB.

United States District Court,
D. Colorado.

July 13, 1999.

Robert E. Purcell, Jerry Thomas Kearns, Reilly & Purcell, PC, Denver, CO, Friederick C. Haines, Atty. General's Office, Denver, CO, Kurt S. Lewis, Webb & Lewis, LLC, Denver, CO, for progressive Games, Inc.

Thomas H. Young, Gregory D. Leibold, Dorsey & Whitney, Denver, CO, Michael Bednarek, Kilpatrick Stocketon, Richard T. Peterson, Kenneth Godlewski, Kilpatrick Stockton LLP, Washington, DC, for Amusements Extra, Inc., Marcel Huard, Distribution, Equipments, Qualite De Casinos Ltee, BDC Mecniaue Distribution, Linda Bouchard, Marcel Guillemette, Futek–MSM Patents, Ltd, Charles Bergeron, Division Extra De Quebec S.A., Jean–Marc Guimont.

## ORDER

BRIMMER, District Judge.

This matter comes before the Court on two Motions for Summary Judgment by Defendants Amusements Extra, Inc. ("AME") and Huard, and Plaintiff's Motion to Strike Unsupported Allegations in Defendants' summary judgment motion. After reading the briefs, hearing oral arguments, and otherwise being fully advised of the premises, the Court **FINDS** and **ORDERS** as follows:

## BACKGROUND

Plaintiff Progressive Games, Inc. ("PGI") owns three patents at issue in this case: Patent No. 5,554,893 issued on August 13, 1996 ("the '893 patent"), Patent No. 5,584,485 issued on December 17, 1996 ("the '485 patent"), and Patent No. 5,626,341 issued on May 6, 1997 ("the '341 patent). The methods and technology covered by these patents involve several aspects of progressive jackpot gaming that stem from the creation of a successful electronic casino card game known as Carribean Stud Poker. Very simply put, the methods and technology involve an electronic poker game in which a player may place a second bet and win a predetermined amount of money if that player's hand is higher than the dealer's hand or contains a predetermined arrangement of cards.

The patents at issue in this case have a long and convoluted history. All three patents date back to and claim priority of U.S.Patent No. 4,861,041 ("the '041 patent"). The '041 patent contains two types of claims: "method" claims directed toward methods of including a jackpot component in a live casino table game and "apparatus" claims directed toward the electronic apparatus for implementing the proposed method. The patent examiner determined that because the method and apparatus claims were directed toward two independent inventions, the patent attorney filing the patent had to elect whether to prosecute the method or the apparatus claims first. The attorney prosecuted the method claims; on August 29, 1989, the '041 patent issued with 19 method claims. The attorney then prosecuted the apparatus claims; on January 7, 1992, U.S.Patent No. 5,078,405 ("the '405 patent") issued. Originally issued to Caribbean Stud Enterprises, Inc., the '041 and '405 patents eventually came to be owned by PGI.

As explained above, the three patents at issue in this case—'893, '485, and '341—are derivative of the original '041 and '405 patents. PGI filed terminal disclaimers in each of the three patent applications providing that the patents would expire simultaneously with their respective earlier issued parent patents. Thus, the '893 patent that contains "jackpot apparatus" claims, expires simultaneously with the '405 patent, the first apparatus patent. The '485 and '341 patents, each containing "jackpot method" claims, expire simultaneously with the '041 patent, the original method patent.

The defendants bringing this motion, a Canadian citizen and a Canadian company, are related to the gaming industry as well. Defendant Marcel Huard, President of Defendant AME, holds a U.S. patent for a gaming system that includes a "random auxiliary jackpot" component. Defendant contends that his patented jackpot feature is different from Plaintiff's patented jackpot feature.

A jackpot may be either random or progressive. When a player wins a progressive jackpot, the jackpot for the next hand is automatically reduced to a predetermined starting level. On the other hand, when a player wins a random jackpot, the jackpot for the next hand may or may not be smaller. Because there is no guarantee that the jackpot in a game with a random jackpot feature will reduce after a player hits the jackpot, random jackpots are thought to hold player interest for a longer period of time.

Defendants bring two summary judgment motions, asking this Court, among other things, to invalidate Plaintiff's patents because of violations of 35 U.S.C. § 112 and the doctrine of laches. Plaintiff moves the Court to strike allegedly unsupported assertions in Defendants' motions.

## ANALYSIS

### 1. Standard

The specific standards for summary judgment are well recognized, and need only be briefly restated. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When applying this standard, the Court must examine the factual record and reasonable inferences drawn therefrom in the light most favorable to the non-moving party. *See Kaul v. Stephan,* 83 F.3d 1208, 1212 (10th Cir. 1996). Summary judgment is appropriate in a patent case, as in any other case, when no genuine issue of material fact is present and the movant is entitled to judgment as a matter of law. *See Brenner v. United States,* 773 F.2d 306, 307 (Fed.Cir.1985).

## 2. Limitations to or Invalidity of Plaintiff's Patents

■ Defendants argue that Plaintiff PGI's cause of action must fail because the scope of PGI's patents does not include the "random" jackpot features that Defendants are allegedly infringing. According to Defendants, because PGI's original patent and specification mention only "progressive" jackpot features (and not "random" jackpots) the term "jackpot," even when used alone, can only be read to encompass progressive jackpots. Thus, Plaintiff's patents should be either (1) declared invalid because the term "progressive," an allegedly "essential element" of the patent, was not included in the claim's language as required by § 112 of the patent statute, or (2) limited only to apparatus and methods for games having progressive jackpots. As the Court will explain, however, genuine issues of fact exist that make summary judgment inappropriate.

According to the patent statutes, "[a] patent shall be presumed valid ... The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." 35 U.S.C. § 282. This presumption exists at every stage of litigation. *Canon Computer Sys., Inc. v. Nu–Kote Int'l, Inc.,* 134 F.3d 1085, 1088 (Fed.Cir.1998). When a "challenger fails to identify any persuasive evidence of invalidity, the very existence of the patent satisfies the patentee's burden on the validity issue." *Id.*

Defendant argues that Plaintiff violates § 112 of the patent statutes by claiming that its patents encompass random jackpot features. Section 112 requires a patent applicant to submit to the Patent Office a complete written description of the invention. *See* 35 U.S.C. § 112. Defendant contends that because Plaintiff's patent did not describe any random jackpot features, any attempt to read the patents as doing so violates § 112. The Court disagrees.

The first claim of the '041 patent, from which the patents at issue are derived, reads as follows:

1. A method of including a jackpot component in a live casino table game comprising the steps of:

   (c) a player wagering a first gaming token to participate in the live casino game

   (d) a player wagering a second gaming token to participate in the jackpot component

   (e) a dealer dealing a hand of playing cards to the player,

   (f) if the player's hand comprises a predetermined arrangement of cards, the player wins a preselected amount of the jackpot.

This claim does not limit itself to a progressive, or any other, kind of jackpot. However, Defendants argue that in this claim's specification, the word jackpot is only used in the context of progressive jackpots; thus, they contend, the entire claim should be read as being limited to progressive jackpots. When the Court views the evidence in the light most favorable to the Plaintiff, however, a different conclusion presents itself.

Granted, each of the patents' specifications undoubtedly mentions progressive jackpots. However, Plaintiff has presented evidence showing that the specifications describe other kinds of jackpots as well. The specifications of the three patents at issue in this case gives examples of award schedules that may be interpreted to be non-progressive, "fixed fee" jackpot prizes.

*See* '893 patent, '485 patent, '341 patent, cols. 4–5. For example, a jackpot award for a full house is set at a fixed 50 tokens, as opposed to a progressive award of 10% of the entire jackpot for a straight flush. Thus, the specification does not necessarily limit itself to progressive jackpots alone.

In addition, each specification contains four separate disclaimers against limiting the scope of the inventions by the descriptions contained within the specification. For example, the '893 patent specifically disclaims that the "invention is not limited to these particular combinations of winning hands or payoffs; other winning hand combinations or payoff amounts can be utilized." Defendant has produced no evidence explaining why these disclaimers should not be taken at face value.

The description of both the fixed fee and progressive types of jackpots, in addition to the disclaimers contained in each patent, create issues of fact concerning the limitation of the patents to merely "progressive jackpots." Because the Court finds issues of fact concerning the intended scope of the patent claims, it is inappropriate at this time to find Plaintiff's patents in violation of § 112. Defendant has failed to carry its burden to show that Plaintiff's patents are invalid or should necessarily be limited. Defendants' motion for summary judgment based upon these arguments is thus **DENIED.**

**3. Laches**

Defendants also argue that they are entitled to summary judgment based upon the doctrine of laches. Specifically, Defendants contend that (1) PGI strung out the prosecution of its patent applications while the commercial market matured through the efforts of others like Defendants Huard and AME, and (2) PGI sought patent rights over others' innovations by filing later claims that became broader in scope than its original patent claims. Defendants argue that PGI, because of these "claim presentation delays," has forfeited its patent rights to any jackpot gaming system. At a minimum, Defendants continue, the Court should interpret PGI's patent rights as encompassing no more than a patent to a progressive jackpot component of a live casino table game, in which the winner wins only a predetermined amount. However, for the reasons that follow, the Court finds that summary judgment based on the doctrine of laches is inappropriate in this case.

The patent laws provide applicants with several procedural vehicles for prosecuting their patent claims, several of which could result in delaying the issuance of a patent. Those vehicles include continuation and continuation-in-part applications, the kinds of applications used by Plaintiff in prosecuting its jackpot patent. These practices often result in a series of patents issuing from a single disclosure, just like the issuance of the '893, '381 and '485 patents from the '041 patent. All these practices are permitted under the patent laws.

However, Defendants argue that equity should bar Plaintiff's recovery for patent infringement because the plaintiff unreasonably delayed the prosecution of its patents, contrary to the patent law's policy of prompt disclosure of patented material to the public. This "prosecution" laches theory can be traced back to a string of Supreme Court cases decided in the 1920s and 1930s.

■ Defendants first cite to *Woodbridge v. United States*, 263 U.S. 50, 44 S.Ct. 45, 68 L.Ed. 159 (1923). *Woodbridge* stands for the proposition that a patent owner's intentional delay in the prosecution of a patent in order to postpone the *term* of the patent monopoly is impermissible. *Id.* at 56–57, 44 S.Ct. 45. However, the *Woodbridge* decision is simply not applicable to the case at bar because Plaintiff has not postponed the term of its patent monopoly. The three patents at issue in this case adopted the same termination date as the original '041 patent. Thus, *Woodbridge* does not apply here.

■ Defendants next point to *Webster Elec. Co. v. Splitdorf Elec. Co.*, 264 U.S. 463, 465–66, 44 S.Ct. 342, 68 L.Ed. 792

(1924), for the proposition that a patent-holder's unreasonable delay in bringing forward claims broader than those sought by the original patent constitutes laches. In *Webster*, the patent-holder did not postpone the term of his patent monopoly but nevertheless lost his patent rights. The Court invalidated the broad claims the patent holder asserted eight years after his original application because he did not "originally intend to assert these amended claims," and did so merely as an "afterthought." *Id.* The Court found that two years was the appropriate time frame within which to bring additional claims. *Id.*

Although *Webster* appears to be closely analogous to the case at bar, it cannot be read in isolation. The Supreme Court's decision in *Crown Cork & Seal Co. v. Ferdinand Gutmann Co.*, 304 U.S. 159, 58 S.Ct. 842, 82 L.Ed. 1265 (1938), limits the scope of *Webster*. The *Crown Cork* Court held that absent "adverse intervening rights," a patentee need not show an excuse for a lapse of more than two years in presenting new claims. *See id.* at 167–168, 58 S.Ct. 842. The Court limited the inequitable delay (or laches) doctrine articulated in *Webster* to cases in which intervening adverse rights[1] and some evidence of

abandonment by the patentee exist. *See id.* at 168, 58 S.Ct. 842.

■ The instant case is not an appropriate one to which to apply the defense of laches. Defendants have produced little evidence that Plaintiff PGI abandoned its original patent or otherwise asserted the patents at issue as a mere afterthought. As mentioned above, the first claim of the original '041 patent allowed for different types of jackpots. It did not limit itself to only "progressive" jackpots, as Defendants claim, but left room for the possibility of other types of jackpots. In fact, PGI has refused in other instances to authorize the patent office to insert the word "progressive" before the word "jackpot."[2] Thus, it cannot be said that PGI filed the three patents at issue in this case as an afterthought, when its original application allowed for the type of jackpot encompassed by those patents.

In addition, the Court is unwilling to apply laches when the Federal Circuit has yet to recognize laches as an equitable defense in cases such as this. Although the Federal Circuit has acknowledged, in dicta, that general equitable remedies relating to a lack of diligence exist in patent cases,[3] it has yet to apply the laches de-

---

**1.** The term "intervening rights," although well known in the context of reissue applications, has seldom been used in reference to continuation applications like the ones at issue in this case. Adverse intervening rights, as applied to continuation applications, are the rights of another which arise after the filing of the first patent application, but before the broadened claims are added to the continuation application. *See* Timothy R. DeWitt, *Does Supreme Court Precedent Sink Submarine Patents?*, 38 IDEA 601, 621 (1998).

At least one court has interpreted *Webster*'s use of the term "adverse intervening rights" to be limited only to unreasonable prosecution delays in a type of patent proceeding known as an interference. *See Ford Motor Co. v. Lemelson*, 42 U.S.P.Q.2d 1706, 1997 WL 294430 (D.Nev.1997). Plaintiff argues that *Lemelson*'s interpretation of *Webster* (in light of *Crown Cork*) should be applied here. However, the Court sees no justification in narrowing *Webster*'s application to unreasonable delays in interference proceedings.

*Webster* was not a decision on appeal from an interference decision, but from an infringement suit. *Webster*, 264 U.S. at 464, 44 S.Ct. 342. In fact, the *Webster* decision makes explicit analogy to reissue, thus making it is reasonable to believe that *Webster*'s reference to "adverse intervening rights" is a reference to reissue-type intervening rights rather than a reference to an interference proceeding. *Lemelson*'s limitation of *Webster* to interference proceedings appears to be an aberration in the law; its reasoning will not be applied here.

**2.** *See Progressive Games, Inc. v. Boardwalk Regency Crop.*, No. 98–1188, slip op. at 22–23 (D.N.J. Aug. 10, 1998).

**3.** *See, e.g., Stark v. Advanced Magnetics, Inc.*, 29 F.3d 1570 (Fed.Cir.1994); *Studiengesellschaft Kohle mbH v. Northern Petrochemical Co.*, 784 F.2d 351 (Fed.Cir.1986).

fense to continuation or continuation-in-part applications. The Court is hesitant to recognize Defendants' laches defense as well. First, although Congress has explicitly limited the time for exercising other rights under the patent process, such as reissue, it has not limited the time for bringing continuation applications. This fact gives rise to a negative inference that continuation applications should not be time-barred, and thus should not be subject to a laches defense.

Second, the facts of this case present, at the very least, a genuine issue of material fact whether Plaintiff's delays were unreasonable. Defendants point to the eight year gap between the issuance of the original patent and the issuance of the three patents involved in this case. However, the length of time between the issuance of patents cannot alone support a laches defense. The patents may have issued late due to circumstances beyond Plaintiff's control, such as bureaucratic red tape in the patent office. Plaintiff has produced evidence that it diligently pursued its continuation applications. Thus, Defendant has failed to carry its burden to show that no issue of fact exists regarding the unreasonable delay of Plaintiff's patent prosecution.

For these reasons, Defendants' motion for summary judgment based upon the defense of laches is **DENIED**.

### 4. Plaintiff's Motion to Strike Unsupported Allegations

Plaintiff moves to strike unsupported allegations in Defendants' summary judgment motion. Because the Court has denied Defendants' summary judgment motions, with or without reference to these allegedly unsupported allegations, this motion is **DENIED AS MOOT**.

### CONCLUSION

For the reasons given above, Defendants' two summary judgment motions, filed November 25, 1998 and December 23, 1998, are **DENIED**. Plaintiff's Motion to Strike Unsupported Allegations in Defendants' motions is **DENIED AS MOOT**.