712 F.Supp.2d 1080 (2010)
In re KATZ INTERACTIVE CALL PROCESSING PATENT LITIGATION.
This document relates to: Ronald A. Katz Technology Licensing, L.P., Plaintiff,
v.
Time Warner Cable Inc., et al, Defendants.
Case No. 07-CV-2134-RGK (FFMx). Case No. CV 2:07-ML-01816-B-RGK (FFMx).
United States District Court, C.D. California.
May 5, 2010.
*1083 Andrew C. Byrnes, Robert T. Haslam, Covington & Burling LLP, Redwood Shores, CA, Dale A. Rice, Michael K. Plimack, Covington & Burling LLP, San Francisco, CA, Frank V. Pietrantonio, Jonathan Garwood Graves, Nathan K. Cummings, Cooley Godward Kronish, Reston, VA, John P. Moy, Moy Patent Law Group PLLC, McLean, VA, Justin Patrick Daniel Wilcox, Scott A. Cole, Cooley Godward Kronish LLP, Reston, VA, Linda A. F. Callison, Lori R. E. Ploeger, Cooley Godward Kronish LLP, Palo Alto, CA, for Plaintiff.
Blas P. Arroyo, Alston & Bird, Charlotte, NC, Frederick L. Cottrell, III, Jeffrey L. Moyer, Kelly E. Farnan, Richards Layton and Finger, Wilmington, DE, Jeffrey A. Cooper, Patrick J. Flinn, Siraj M. Abhyankar, Angela Payne James, Brie A. L. Brown, Holly S. Hawkins, Jessica E. Jacob, Kamran Jivani, Robin L. McGrath, Alston & Bird LLP, Atlanta, GA, Jeffrey S. Standley, Standley Law Group, Dublin, OH, Matthew J. Moore, Latham & Watkins LLP, Washington, DC, Michael K. Plimack, Covington & Burling LLP, San Francisco, CA, Robert T. Haslam, Covington & Burling LLP, Redwood Shores, CA, Alan L. Whitehurst, Alston and Bird LLP, Washington, DC, for Defendants.

ORDER RULING ON THE INDIVIDAL SUMMARY JUDGMENT MTIONS RELATED TO THE CHATER DEFENDANTS
R. GARY KLAUSNER, District Judge.

TABLE OF CONTENTS

 I. INTRODUCTION .....................................................................1085
II. JUDICIAL STANDARD .................................................................1085
III. CHARTER'S DEFENSES ...............................................................1086
 A. Invalidity ....................................................................1086
 1. Legal Standard ............................................................1086

*1084
 2. Indefiniteness ............................................................1086
 a. Legal Standard-Indefiniteness Generally ................................1087
 b. 35 U.S.C. § 112 ¶ 6 ....................................................1087
 c. Individually Cueing Means ..............................................1087
 3. Written Description .......................................................1089
 B. Infringement/Non-Infringement .................................................1089
 1. Legal StandardNon-Infringement ...........................................1089
 2. Charter's Motion for Non-InfringementClaims 10 and 11 of the
 '150 Patent ..............................................................1090
 a. Multiple Formats .......................................................1090
 b. Selecting and Testing ..................................................1092
 i. Meaning of "Call Data Signals" .....................................1092
 ii. Sequence of Steps ..................................................1092
 c. Multiple Port, Multiple Format .........................................1093
 d. Fetching Control Data with "Call Data" .................................1093
 3. Katz's Motion for InfringementClaims 10 and 11 of the '150 Patent.........1094
 a. Multiple Formats .......................................................1094
 b. Multiple Port, Multiple Formats ........................................1094
 c. Selecting a Format Under Control of Call Data Signals ..................1094
 d. Fetching Control Data with "Call Data" .................................1094
 e. Evidence That Calls Were Processed .....................................1095
 4. Claim 5 of the '223 Patent ................................................1095
 a. "Means for Providing Identification Signals" ...........................1095
 b. Signals vs. Data .......................................................1096
 c. Synthesized Voice Signals ..............................................1096
 d. Selectively Receiving Calls ............................................1097
 e. "Common Processing Operations" .........................................1097
 5. Claim 1 of the '285 Patent ................................................1097
 a. Multiple Port, Multiple Format .........................................1098
 b. Interconnect Switch Means ..............................................1098
 c. Selections Means .......................................................1098
 d. Multiple Formats .......................................................1099
 6. Claim 2 of the '415 Patent ................................................1099
 a. "Associated Telephone Number Signals" ..................................1100
 b. "Testing ... to Determine the Acceptability of Said Calls" .............1101
 7. Claim 129 of the '707 Patent ..............................................1101
 a. Voice Generator ........................................................1101
 b. Negative File Data .....................................................1102
 c. "Means for Processing ..."..............................................1102
 d. "Means for Providing ... and for Receiving" ............................1103
 8. Claims 30, 45 and 67 of the '762 Patent ...................................1103
 a. "Acknowledgement Number" ...............................................1104
 b. "Credit Verification Structure" ........................................1106
 c. "Synthesized Voice" ....................................................1106
 d. Central Processing Station .............................................1106
 e. "Means to Provide Answer Data Signals" .................................1106
 9. Evidence That CSS Actually Performed the Methods ..........................1107
 10. Means Plus Function Limitations Involving a Processor .....................1107
 C. Laches ........................................................................1107
 D. Damages .......................................................................1108
 1. After 2005 .................................................................1108
 2. Non-Accused Systems ........................................................1108
IV. KATZ'S MOTION FOR SUMMARY JUDGMENT ...............................................1108
 A. Equitable Estoppel ............................................................1109
 B. Laches ........................................................................1109
 1. Legal StandardLaches ......................................................1109
 2. Unreasonable Delay .........................................................1110
 3. Prejudice ..................................................................1111

*1085
 a. Evidentiary Prejudice ...................................................1111
 b. Economic Prejudice ......................................................1111
 C. Prosecution History Laches ....................................................1112
 1. Legal StandandProsecution Laches ..........................................1112
 2. Unreasonable Delay .........................................................1113
 3. Intervening Adverse Rights .................................................1113
 V. SUMMARY ..........................................................................1113

I. INTRODUCTION
In approximately fifty different lawsuits, plaintiff Ronald A. Katz Technology Licensing, L.P. ("Katz") has alleged that various defendants infringe claims from its family of related interactive call processing patents. The Judicial Panel on Multidistrict Litigation consolidated these cases for pretrial proceedings and transferred the consolidated case to this Court (07-MDL1816). This Court grouped the different cases based roughly on the date they were transferred. The current case is part of the group B cases.
In managing the group B cases, this Court ordered Katz to eventually limit the number of claims it was asserting against each defendant group to sixteen. This Court has already ruled on various joint summary judgment motions filed by the group B defendants and found that a number of the asserted claims were invalid as obvious under 35 U.S.C. § 103 or invalid for lack of written description and/or indefinite under 35 U.S.C. § 112.
Plaintiff Katz has nine remaining claims against defendants Charter Communications, Inc., Charter Communications Holding Company, LLC, Charter Communications Operating, LLC, and Charter Communications Entertainment I, LLC (collectively, "Charter"). They are: claim 5 of U.S. Patent No. 6,434,223 ("the '223 patent"), claim 1 of U.S. Patent No. 5,351,285 ("the '285 patent"), claim 129 of U.S. Patent No. 5,561,707 ("the '707 patent"), claim 2 of U.S. Patent No. 6,512,415 ("the '415 patent"), claims 30, 45 and 67 of U.S. Patent No. 5,898,762 ("the '762 patent"), and claims 10 and 11 of U.S. Patent No. 4,930,150 ("the '150 patent").
On March 27, 2009, Charter filed a Notice of Commencement of Bankruptcy Proceedings and Automatic Stay. Accordingly, pursuant to 11 U.S.C. § 362, this Court stayed Katz's action with respect to Charter only. As a result, this Court did not rule on any motions directly related to Charter and this ruling has no preclusive effect on Charter. Charter has now emerged from bankruptcy and this Court has reopened the action against Charter on February 4, 2010.
Charter moves for summary judgment on three sets of issues. First, Charter argues that seven claims are invalid under 35 U.S.C. § 112: claim 5 of the '223 patent, claim 1 of the '285 patent, claim 129 of the '707 patent, claim 2 of the '415 patent, and claims 30, 45 and 67 of the '762 patent. Second, Charter's motion for summary judgment argues that it does not infringe any of the nine remaining claims. Finally, Charter argues that the doctrine of laches bars plaintiffs claim in its entirety. Katz also moves for summary judgment on the issues of infringement, and Charter's affirmative defenses of estoppel, laches, and prosecution laches.

II. JUDICIAL STANDARD
Summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248, 106 *1086 S.Ct. 2505, 91 L.Ed.2d 202 (1986); see also Karlin Tech., Inc. v. Surgical Dynamics, Inc., 177 F.3d 968, 970 (Fed.Cir.1999). A dispute about a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. A party opposing a properly supported motion for summary judgment "`may not rest upon the mere allegations or denials of his pleading, but... must set forth specific facts showing that there is a genuine issue for trial.'" Id. (quoting First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). "If the evidence [opposing summary judgment] is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-250, 106 S.Ct. 2505 (citations omitted).
Even where the movant does not seek judgment as to the whole action, "the court should, to the extent practicable, determine what material facts are not genuinely at issue." Fed.R.Civ.P. 56(d)(1). "It should then issue an order specifying what factsincluding items of damages or other reliefare not genuinely at issue." Id. Thus, "judgment may be rendered on liability alone...." Fed.R.Civ.P. 56(d)(2).

III. CHARTER'S DEFENSES

A. INVALIDITY

1. Legal Standard-Indefiniteness Generally
An indefiniteness defense is based on 35 U.S.C. § 112 ¶ 2, which states:
The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.
The statute is satisfied if a person skilled in the art would reasonably understand the claim when read in the context of the specification. Marley Mouldings Ltd. v. Mikron Industries, Inc., 417 F.3d 1356, 1359 (Fed.Cir.2005). A claim is presumed valid. Therefore, it is only indefinite if it is "insolubly ambiguous, and no narrowing construction can be adopted." Microprocessor Enhancement Corp. v. Tex. Instruments, Inc., 520 F.3d 1367, 1374 (Fed.Cir.2008) (citations omitted). The issue of indefiniteness is a matter of law for the court to decide. Personalized Media Commc'ns, LLC v. Int'l Trade Com'n, 161 F.3d 696, 705 (Fed.Cir. 1998).

2. Indefiniteness
Charter relies on three different theories to argue that seven of the claims asserted against it are invalid as indefinite under 35 U.S.C. § 112. First, Charter argues that claim 5 of the '223 patent, claims 40, 45 and 67 of the '762 patent, and claim 1 of the '285 patent are indefinite because the specifications fail to disclose an algorithm as required by WMS Gaming Inc. v. Int'l Game Tech., 184 F.3d 1339, 1349 (Fed.Cir.1999). Second, Charter argues that claim 5 of the '223 patent, claim 129 of the '707 and claims 30, 45 and 67 of the '762 patent are indefinite because they improperly mix limitations from apparatus and method claims. See IPXL Holdings, L.L.C. v. Amazon.com, Inc., 430 F.3d 1377, 1383-84 (Fed.Cir.2005). Finally, Charter argues the term "qualification unit" in claim 129 of the '707 patent was insolubly ambiguous thus rendering the claim indefinite.
On August 27, 2008, this Court granted plaintiff's application to strike portions of Charter's motion on the grounds that Charter failed to disclose these arguments during discovery. On September 22, 2008, this Court GRANTED IN PART Charter's motion to reconsider. Based on those rulings, the only remaining issue is whether claim 5 of the '223 claim is indefinite in *1087 view of WMS Gaming. This Court addressed this very issue when ruling on AOL's motion for summary judgment. (August 13, 2009 Order Ruling on the Parties Summary Judgment Motions at pp. 6-10.) For the sake of completeness, this substance of that decision is repeated here.

a. Legal Standard-Indefiniteness Generally
An indefiniteness defense is based on 35 U.S.C. § 112 ¶ 2, which states:
The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.
The statute is satisfied if a person skilled in the art would reasonably understand the claim when read in the context of the specification. Marley Mouldings Ltd. v. Mikron Industries Inc., 417 F.3d 1356, 1359 (Fed.Cir.2005). A claim is presumed valid. Therefore, it is only indefinite if it is "insolubly ambiguous, and no narrowing construction can be adopted." Microprocessor Enhancement Corp. v. Tex. Instruments, Inc., 520 F.3d 1367, 1374 (Fed.Cir.2008) (citations omitted). The issue of indefiniteness is a matter law for the court to decide. Personalized Media Commc'ns, LLC v. Int'l Trade Com'n, 161 F.3d 696, 705 (Fed.Cir.1998).

b. 35 U.S.C. § 112 ¶ 6
The parties agree that the "means for individually cueing" limitation is a means plus function limitation governed by 35 U.S.C. § 112, ¶ 6. A means plus function limitation is interpreted to encompass: 1) the recited function, and 2) the structures disclosed in the specification that correspond to that function and their equivalents. Applied Med. Res. Corp. v. U.S. Surgical Corp., 448 F.3d 1324, 1332 (Fed.Cir.2006). When a means plus function limitation discloses a computer or microprocessor programmed to carry out an algorithm as the corresponding structure, "the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm." WMS Gaming Inc. v. Int'l Game Tech., 184 F.3d 1339, 1349 (Fed.Cir.1999). Only disclosing a general purpose computer as the structure for performing a claimed function amounts to pure functional claiming and does not satisfy 35 U.S.C. § 112 ¶ 6, thereby rendering the claim indefinite under 35 U.S.C. § 112 ¶ 2. Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech., 521 F.3d 1328, 1333 (Fed.Cir.2008); see Net MoneyIN, Inc. v. VeriSign, Inc. 545 F.3d 1359, 1367 (Fed.Cir.2008) ("a means-plus-function claim element for which the only disclosed structure is a general purpose computer is invalid if the specification fails to disclose an algorithm for performing the claimed function.")

c. Individually Cueing Means
The recited function of the limitation at issue is "individually cueing said callers of said select subset to prompt digital signals." With respect to Charter's indefiniteness argument there are two primary disputes. First, although both parties agree that the interface processor 26 performs the recited function, Charter characterizes the structure as a general purpose processor while Katz says that it is a special purpose processor. Second, the parties disagree on whether the '223 patent specification discloses algorithms to perform the recited function.
Charter relies on this Court's February 21, 2008 Claim Construction Order to argue that interface processor 26 is a general purpose processor. At that time, the issue before the Court was whether the "means for processing" found in claim 4 of U.S. Patent No. 5,128,984 and claim 6 of U.S. Patent No. 5,251,252 was subject to WMS Gaming. The structure that performed *1088 the recited functions in those patents is the same interface processor 26 at issue here. During the claim construction briefing, Katz did not argue that interface processor 26 was a special purpose processor. Rather Katz contended that "in order for the algorithm to be a required element of the claim construction, the algorithm must be both disclosed and the point of novelty of the claimed invention." (Pl.'s Opening Claim Construction Brief at p. 5, (emphasis in original)). The Claim Construction Order rejected Katz's argument and applied WMS Gaming. (Claim Construction Order at pp. 22-24) Charter concludes that this Court necessarily found that the interface processor was a general purpose computer. If Charter is correct, WMS Gaming applies and the specification must disclose an algorithm that is responsible for "individually cueing said callers of said select subset to prompt digital signals."
Katz disagrees and argues that the interface processor 26 is a special purpose processor. Specifically, Katz's expert, Dr. Brody characterizes the interface processor as a "special purpose device dedicated to providing an interface between the system and the telephone facility." (Brody Decl. re Katz Opp'n to Defs.' Summ. Js. at ¶ 20) In support of this position, Dr. Brody relies on a passage in the '223 patent that describes the operation of the interface processor 26.
With the receipt of a call at the interface processor 26, a voice generator may be actuated to specifically inform a caller, depending upon the specific format employed. Essentially, digital signals are provided to actuate a voice generator within the processor 26. Accordingly, an audio message is provided through the coupler 24, the associated audio response unit, and the communication facility CO to the connected remote terminal. Thus, the caller may be further informed or cued.
'223 patent at 9:34-43.
According to Dr. Brody, a person of ordinary skill in the art would "recognize that the interface processor is a complete or a substantial part of a VRU, a well known special purpose device and not a general purpose computer." (Brody Decl. re Katz Opp'n to Defs.' Summ. Js. at ¶ 20.)
This Court finds that the interface processor 26 is a general purpose processor. Charter correctly points out that the parties' earlier claim construction briefs assumed that the interface processor 26 was a general purpose processor. Now it appears that Katz is attempting to characterize the interface processor as a special purpose processor because the Court rejected its "point of novelty argument." However, it is too late for Katz to ask the Court to review the February 21, 2008 Claim Construction Order. Moreover, even if the Court did so, the evidence does not suggest that the interface processor is a special purpose processor. The cited passage merely describes the function the interface processor performs; it does not suggest that the interface processor is some form of special purpose processor. Finally, Dr. Brody concludes that a VRU (Voice Response Unit) is a well known special purpose device. (Brody Decl. re Katz Opp'n to Defs.' Summ. Js. at ¶ 20.) That statement is not helpful because the issue is how to characterize the interface processor within a VRU, not the VRU itself. As a result, this Court finds that the rule in WMS Gaming does apply to the individually cueing means.
Thus, to satisfy WMS Gaming, the '223 patent must disclose the algorithms that perform the function of "individually cueing said callers of said select subset to prompt digital signals." Katz argues that the recited function is shown by step 72 of Figure 2 (partial view shown to the right). *1089 Specifically, Dr. Brody says that in box 72 the caller is cued and the answer of the caller is registered. (Brody Decl. re Katz Opp'n to Defs.' Summ. Js. at ¶ 23.) However, a simple box with the term "register answer" is not an algorithm. Dr. Brody also cites to two other passages in the patent. See '223 patent at 10:7-17 and 5:53-55. These passages do not describe any algorithm for "individually cueing said callers of said select subset to prompt digital signals." Rather they simply indicate that the interface processor poses questions to the callers. Based on the foregoing, this Court GRANTS Charter's motion for summary judgment and finds claim 5 of the '223 patent invalid as indefinite.

3. Written Description
Charter also argues that claim 1 of the '415 patent is also invalid under 35 U.S.C. § 112 for lack of a written description. Again, this Court's August 27, 2008 order struck this argument for failing to disclose it during discovery. As a result, this Court does not reach the merits of this issue.

B. INFRINGEMENT/NON-IFRINGEMENT
Charter argues that its accused Customer Service System ("CSS") does not infringe claims 10 and 11 of the '150 patent, claims 30, 45 and 67 of the '762 patent and claim 129 of the '707 patent. At the same time, Katz's motion for summary judgment asks for a ruling of infringement with respect to claim 10 and 11 of the '150 patent. This decision addresses that portion of Katz's motion here.[1]

1. Legal StandardNon-Infringement
Under the Patent Act, 35 U.S.C. § 271, liability for patent infringement may be imposed on any person who, without permission of the patentee, "makes, uses, offers to sell, or sells any patented invention [] within the United States or imports into the United States any patented invention during the term of the patent therefore." *1090 The rights granted to the patentee are defined by the patent's claims. Markman v. Westview Instruments, Inc., 517 U.S. 370, 373, 116 S.Ct. 1384, 134 L.Ed.2d 577, (1996).
In determining whether an allegedly infringing device falls within the scope of the claims, a two-step process is used: first, the court must determine as a matter of law the meaning of the particular claim or claims at issue; and second, it must consider whether the accused product infringes one or more of the properly construed claims. Id. at 384, 116 S.Ct. 1384; Allen Eng'g Corp. v. Bartell Indus., Inc., 299 F.3d 1336, 1344 (Fed.Cir.2002). The second inquiry is a question of fact, although summary judgment of infringement or non-infringement may nonetheless be appropriate when no genuine dispute of material fact exists. Irdeto Access, Inc. v. Echostar Satellite Corp., 383 F.3d 1295, 1299 (Fed.Cir.2004) (quoting Bai v. L & L Wings, Inc., 160 F.3d 1350, 1353 (Fed.Cir. 1998)).
The patentee bears the burden of proving infringement by a preponderance of the evidence. Laitram Corp. v. Rexnord, Inc., 939 F.2d 1533, 1535 (Fed.Cir. 1991). This burden can be met by showing that the patent is infringed either literally or under the doctrine of equivalents. See Linear Tech. Corp. v. Impala Linear Corp., 379 F.3d 1311, 1318 (Fed.Cir.2004). To support a finding of literal infringement, the patentee must establish that "every limitation recited in the claim appears in the accused product, i.e., the properly construed claim reads on the accused product exactly." Jeneric/Pentron, Inc. v. Dillon Co., 205 F.3d 1377, 1382 (Fed.Cir. 2000) (citing Amhil Enters. Ltd. v. Wawa, Inc., 81 F.3d 1554, 1562 (Fed.Cir.1996)).

2. Charter's Motion for Non-Infringement-Claims 10 and 11 of the '150 Patent
Charter raises four non-infringement arguments with respect to claims 10 and 11 of the '150 patent. Together these claims recite:
10. A process for interfacing a telephonic communication system including remote terminals with a multiple port, multiple format data processing system, said multiple port, multiple format data processing system for concurrently processing data from said remote terminals according to a plurality of formats, at least one of said formats having at least one condition for a calling terminal, and wherein said telephonic communication system provides call data signals, as to indicate called and calling numbers, said process including the steps of:
receiving said call data signals from said telephonic communication system for a calling remote terminal;

selecting a processing format of said multiple port, multiple format processing system for the calling remote terminal under control of said data signals as the selected format;
testing the selected format in relation to said call data signals; and

conditionally interfacing said selected format to a calling terminal under control of said testing of call data signals.
11. A process according to claim 10 further including the step of fetching control data addressable with said call data for use in the step of testing.
(emphasis added).

a. Multiple Formats
The parties agree that claim 10 requires multiple "formats." This Court previously defined "format" as follows:

*1091 Format refers to a call processing flow implemented by at least one computer program that sets forth the content and sequence of steps to gather information from and convey information to callers through pre-recorded prompts and messages. Selection of, or branching to, a module or subroutine within a computer program does not constitute selection of a separate format. Selection of (or branching to), a second computer program by a first computer program, that together implement a call process flow application also does not constitute selection of a separate format.
(February 21, 2008 Claim Construction Order at p. 16.)
Katz argues that Charter's call centers supported multiple call processing flows that correspond to different formats. Katz says Charter's formats include the Tier 2 Support Main and Customer Care formats.[2] These call flows were associated with different telephone numbers. Charter's system directed calls to 1-888-550-9400. These calls were sent to the main menu for "Tier 2 Support." (Kelly Decl. ¶ 29; Newland Decl. Ex. 10 at CHA0010868.) Similarly, calls to 1-866-472-7100 were directed to the Customer Care call flow. That call flow checked the caller's number against a table of blocked numbers. If the numbers were not blocked, the caller was allowed to proceed. (Kelly Decl. ¶ 30; Newland Decl. Ex. 10 at CHA0010878.)
Katz says that these two numbers and calls flows represent two different formats while Charter argues that they are simply part of one large format. In support of its multiple format position, Katz points out that each flow is accessed through one or more unique numbers. Katz also argues that each call flow is not a branch or subroutine of a single computer program. In support of the single format position, Charter points out that Charter's Core Routing Application and vector software modules implement the different call flows Katz identifies. Specifically, a call enters Charter's Avaya Definity G3PBX/ACD ("G3"). Subsequently, the Core Routing Application, which runs on the G3, links the call's DNIS (i.e. the called number) to a Vector Directory Number ("VDN"). The VDN points the call to a vector software module within the G3. The vector software module determines how the call is handled. Relying on these facts, Charter argues that its system only uses a single core routing application to process calls and "the vector software modules are simply branches from or subroutines of the Core Routing Application." (Charter's Opp'n to Summ. J. at p. 5.) Since the definition of format states that selection or branching to a module, a subroutine or a second program does not constitute selecting a separate format, Charter concludes that the call flows Katz identifies relate to a single format. Charter overstates the impact of the Court's claim construction. Although branching does not constitute selection of a separate format, the existence of branching does not exclude the possibility of a separate format.
In sum, Katz has presented evidence that the Tier 2 Support and Customer Care flows are accessed by different unique telephone numbers. This evidence suggests that these services correspond to multiple formats. Moreover, Charter's evidence does not show that there is only one format. Accordingly, this Court DENIES Charter's motion for summary judgment on this issue.

*1092 b. Selecting and Testing
Claim 10 requires: 1) "selecting a processing format ... under control of said call data signals as the selected format," 2) "testing the selected format in relation to said call data signals," and 3) "conditionally interfacing said selected format." Charter argues that its CSS system does not perform these steps and the accused features are not performed in the required order.

i. Meaning of "Call Data Signals"
In support of the first argument, Charter interprets "call data signals" to require both ANI and DNIS signals. Since, Charter CSS only selects a format based on DNIS (i.e. the called number), Charter concludes that CSS does not select a format based on call data signals. Since CSS only tests ANI (i.e. the calling number) to determine whether the call may proceed, Charter concludes that CSS does test call data signals and does not conditionally interface the call based on the test. Accordingly, Charter argues that three limitations from claim 10 are not satisfied.
In response, Katz challenges Charter's claim construction. Relying on two previous orders in this MDL, Katz argues that "call data signals" can refer to any one of several call signals. Indeed, that is precisely what this Court found when it defined "call data signals" to refer to "signals identifying the called number, the calling number, and/or an equipment type designation." (February 21, 2008 Claim Construction Order at pp. 48-49; see August 14, 2008 Order Denying Defendants' Motion for Partial Reconsideration of 112 SJ Denial at 4-5 (finding that with respect to claim 10 of the '150 patent "testing ... call data signals" only required either the called or the calling number); Order Denying In Part Defendants' Joint Motion for Summ. J. of Invalidity Under Section 112 at p. 23.)
Although Charter points out that the Section 112 Orders only discussed "call data signals" in terms of the testing step, not the selecting step, that distinction is irrelevant. "Call data signals" carries the same meaning in both parts of the claim. Finally, Charter focuses on the language "for the calling remote terminal" to argue that equipment signals must be present. (Charter Opp'n to Summ. J. at pp. 16-17.) Specifically, Charter argues that to select a format for the remote terminal, the system must receive equipment signals that indicate "whether the caller is using either a rotary or touch-tone phone, and based on those equipment signals, choosing a "format" that can function with that particular terminal." (Charter Opp'n to Summ. J. at p. 17.) Charter reads too much into the term "for." The plain meaning of "for" means "on behalf of." That interpretation is entirely consistent with both the claim language and specification. Accordingly, this Court finds that Katz has presented substantial evidence to satisfy each of the three limitations discussed above.

ii. Sequence of Steps
Charter also argues that the accused CSS steps were not performed in the required order. Katz says that ANI blocking (i.e. not permitting callers associated with certain numbers to proceed) satisfies the "testing" step. However, Charter argues that the claim requires that the testing step occur before the format starts while ANI blocking occurs after the call processing flow has started. Therefore, Charter concludes that there is no infringement.
In response, Katz does not challenge Charter's claim interpretation. Rather, Katz argues that ANI blocking occurs before the callers interface with the format. In support of Katz's position, Katz's expert, Dr. Kelly, points to how "vector 10" operates. (Charter App. Ex 58, (CHA *1093 0010813).) The ANI block is performed. If the caller is not "blocked," information is conveyed to the caller for the "first" time. (Dr. Kelly Decl. ¶ 40.) Thus, Dr. Kelly concludes that the format begins after the testing step.
Charter disagrees with Dr. Kelly's characterization because ANI blocking affects the caller's experience. The definition of format refers to "a call process flow that sets forth the content and sequence of steps to gather information from and convey information to caller." Since a caller will receive a busy signal if it is "blocked," Charter argues that a caller receives different content according to the ANI Block vector processing. Therefore, Charter concludes that the ANI Block must be part of the alleged format.
This Court rejects Charter's argument. The busy signal can hardly be considered part of the information conveyed to the caller. Moreover, CHA0010813 shows that the caller does not receive any information and cannot make any choices prior to the ANI Blocking step. Therefore, a reasonable juror could conclude that the format does not begin until after ANI Blocking. Based on the forgoing, this Court DENIES Charter's summary judgment as it relates to the limitations discussed in this section.

c. Multiple Port, Multiple Format
Claim 10 requires interfacing callers to a "multiple port, multiple format data processing system." Dr. Kelly states that portions of the Avaya Definity G3s and each of the Dialogic Communications Corp. IVRs satisfy this limitation. (Dr. Kelly Decl. ¶ 55.) He also says that these components have processors with multiple ports, which accommodate multiple formats. (Dr. Kelly Decl. ¶ 56.) Charter argues that these allegations are insufficient because Dr. Kelly has failed to identify a specific processor in Charter's CSS to which a call was connected. Here, Katz's expert has identified the systems that contain the accused processor. Charter's opposition does not appear to contest that these systems contain processors. Nor does Charter's opposition suggest that Dr. Kelly is incorrectly testifying that the processors have the required limitations. Instead, Charter appears to believe that Dr. Kelly should identify the processors with a higher level of detail. This complaint is not sufficient to justify granting summary judgment. Accordingly, this Court DNIES Charter's motion for summary judgment as it relates to the multiple port, multiple format limitation.

d. Fetching Control Data with "Call Data"
Claim 11 recites "further including the step of fetching control data addressable with said call data...." Katz argues that the ANI blocking table satisfies this limitation "by fetching data from the vector routing table (`VRT') of blocked ANIs on Charter's Avaya Definity G3s for testing against received ANI's to determine whether or not to provide a fast busy signal and terminate the call." (Katz Charter Opp'n to Summ. J. at p. 7.) Charter argues that the ANI blocking table cannot satisfy claim 11 because the phrase "control data" refers to "both the called number and equipment data signals." (Charter Summ. J. at p. 15 (emphasis in original).) Since the ANI blocking table only uses one type of "call data," Charter concludes that there is no infringement.
This Court has already rejected Charter's interpretation of "call data" above in subsection (b). The limitation can be satisfied by the called number, calling number and/or equipment type designation. Accordingly, this Court also DENIES Charter's motion for summary judgment with respect to the issues raised here.

*1094 3. Katz's Motion for Infringement-Claims 10 and 11 of the '150 Patent
Katz's motion for summary judgment asks the Court to rule that Charter's CSS infringes claim 10 and 11. For the most part, both parties took the same positions found in the briefing on Charter's motion for summary judgment. To the extent the Court's analysis is the same, this decision will merely provide the Court's ruling on Katz's motion.

a. Multiple Formats
Although Katz has presented evidence that suggest that CSS supports more than one format, there are a number of factual questions left open. For example, what is the relationship between the Tier 2 Support and Customer Call flows? Do they support different services? Does one flow allow callers to access the other flow? Although these questions are not dispositive, there is simply insufficient evidence for the Court to rule on this issue. Moreover, Charter assails the accuracy of the documents Katz relies upon, calling them "preliminary." Although Charter's expert relied on these same documents, there are credibility issues to be determined. In sum, this Court finds that there is a factual issue as to whether there is more than one format.

b. Multiple Port, Multiple Format
Katz's expert has generally testified that portions of the Avaya Definity G3s and each of the Dialogic Communications Corp. IVRs satisfy the multiple port, multiple format data processing limitation. (Dr. Kelly Decl. 1155.) Although the content of his testimony sufficiently raises a triable issue of fact, Charter raises a number of issues regarding the credibility of Dr. Kelly's opinion. In particular, Charter argues that Dr. Kelly has changed positions and cannot describe the specific processor in sufficient detail to provide a basis for his conclusion. These arguments present credibility issues for the jury. Accordingly, this Court finds that there is a factual issue with respect to the multiple port, multiple format limitation.

c. Selecting a Format Under Control Of Call Data Signals
As discussed above, this Court rejects Charter's interpretation of "call data signals." In its opposition to Katz's motion for summary judgment, Charter raises two additional non-infringement arguments.
First, Charter argues that to the extent that a format is actually selected, the format is selected under control of the VDN, not the DNIS. Although multiple DNIS entries can point to a single VDN, this does not change the fact that the selection uses the DNIS (i.e. the called number). Second, Charter argues that there is a distinction between "data" and "data signals." This Court sees nothing within the specification or the claims to justify this distinction. Accordingly, this Court rejects both of these arguments as well. In sum, this Court finds that using DNIS to make a selection satisfies the "under control of said [call] data signals" portion of claim 10.

d. Fetching Control Data with "Call Data"
As discussed above, this Court rejects Charter's interpretation of "call data signals." In its opposition to Katz's motion for summary judgment, Charter raises an additional non-infringement argument. Specifically, Charter interprets "fetching control data addressable with said call data" to mean "identification of a memory location and retrieval of its contents wherein the address of the memory location is addressed by the call data." (Charter Opp'n to Summ. J. at 21.) Charter's interpretation impermissibly imports limitations from the disclosed embodiment. See Chimie v. PPG Indus., Inc., 402 F.3d *1095 1371, 1379 (Fed.Cir.2005). Since there is nothing in the claim language itself to limit the claim in the manner Charter suggests, this Court reject's Charter's claim construction. Accordingly, this Court finds that using the ANI blocking table satisfies the limitation at issue.

e. Evidence That Calls Were Processed
Finally, Charter generally argues that Katz has failed to present evidence that calls were actually handled in the manner outlined by the experts, witnesses and documents. Specifically, Charter argues that Katz's evidence shows only how Charter's system was designed, not how it operated. This Court disagrees. Katz has presented strong circumstantial evidence. Evidence of the design of a system is also strong evidence of a system's operation. To the extent that Charter relies on this argument to refute Katz's motion for summary judgment, the Court rejects this evidentiary argument.
In its motion and supporting papers, Katz has shown that several of the limitations in dispute were satisfied by Charter's CSS. However, this Court has found factual issues with respect to various other limitations. Accordingly, this Court DENIES Katz's motion for summary judgment of infringement.

4. Claim 5 of the '223 Patent
Charter raises five separate noninfringement arguments with respect to claim 5 of the '223 patent. Although this decision found that claim 5 was invalid as indefinite, the Court will address Charter's non-infringement arguments. Claim 5 recites:
5. A telephone call processing system for receiving calls through a telephone communication facility from a multitude of terminals for processing in a select interface format wherein callers are cued by synthesized voice signals supplied to said multitude of terminals and respond with digital signals, as by actuating push buttons at said multitude of terminals, said telephone call processing system comprising:
means for selectively receiving calls from said multitude of terminals to establish telephone communication with a select subset of callers, said means for selectively receiving calls comprising means for receiving calls in a plurality of call modes including a toll free calling mode and a caller charge calling mode or an area code mode;
means for providing identification signals entered by said callers of said select subset;
means for individually cueing said callers of said select subset to prompt digital signals, wherein at least certain of the cues and their responsive digital signals are a part of common processing operations for the plurality of call modes to isolate a sub-subset of said callers; and
means for storing identification signals for said callers of said sub-subset.

a. "Means for Providing Identification Signals"
Claim 5 recites a "means for providing identification signals entered by said callers of said select subset." Katz identified "a processor with DTMF detection capability in each of Avaya Definity G3s" as the "means for providing identification signals." (Kelly Decl. ¶ 62.) Charter argues its systems had no such processor, and instead that the DTMF detection capability was provided through "cards" (i.e. "boards" or "circuit packs"), known as tone detectors (touch tone decoder or touch tone receiver). (Charter Summ. J. at p. 16.) However, Katz argues that Charter's arguments are consistent with its analysis. Specifically, Dr. Kelly says that these *1096 cards resided in the Avaya Definity G3s and that they contained the processors with DTMF detection capability. (Kelly Decl. ¶ 64.) In its reply brief, Charter challenges the basis for Dr. Kelly's conclusion, but not the conclusion itself.
In sum, Katz argues that processors with DTMF detection capability are found in the cards or circuit packs in the Avaya Definity G3s. Charter merely argues that there is not sufficient evidence to support that conclusion. The parties have not presented a sufficient record for this Court to resolve this question. Accordingly, this Court finds that there is a factual issue with respect to whether the processor with DTMF detection capability in each of Avaya Definity G3s satisfies the "means for providing identification signals" limitation.

b. Signals vs. Data
As noted above, claim 5 requires a "means for providing identification signals entered by said callers." Charter argues that the claim language requires a means for providing "signals," not "data," entered by a caller. (Charter Summ. J. at p. 17.) Relying on this claim interpretation, Charter goes on to state that Katz has only provided evidence that a caller enters "data." As stated in Section III(B)(3)(c), neither the specification nor the claims justify this distinction. Accordingly, this Court rejects this argument.

c. Synthesized Voice Signals
The preamble of claim 5 requires that "callers [be] cued by synthesized voice signals." Katz interprets the term "synthesized voice signals" to include concatenated pre-recorded voice signals. Relying on that interpretation, Katz argues that Charter's system satisfied the limitation by combining and playing pre-recorded voice prompts to callers.
Charter disagrees with Katz's claim construction and argues that synthesized voice signals do not encompass pre-recorded voices regardless of whether they are concatenated. In addition, Charter's Reply brief argues that Katz has failed to identify a processor responsible for voice synthesis capability and that the example messages Katz identified are not "prompts."
Charter interprets the term "synthesized voice signals" to exclude the use of pre-recorded human voice. In support of that interpretation, Charter relies on a statement that Katz's expert, Dr. Brody, made in opposing defendants' joint motion for invalidity under § 112.
This passage describing a "voice generator" providing a "simulated voice" question necessarily describes and discloses to the POSITA at the relevant 1989 time period that the voice generator generates synthesized voice signals, which are "simulated" rather than prerecorded human voice.
(Brody Decl. in Opp'n to 112 Summ. J. at ¶ 142 (emphasis added).)
Thus, Dr. Brody was contrasting "synthesized voice signals" from a "prerecorded human voice." However, Katz and Dr. Brody now argue that synthesized voice signals include concatenations of pre-re-corded human speech, or "concatenative synthesis." (Brody Decl. in Opp'n to 112 Summ. J. at ¶¶ 271-283.) In support of that position, Dr. Brody points out that at least some of the references found in the '223 patent prosecution history describe speech synthesis in terms of concatenating different phrases. See Perdue et al., "Conversant 1 Voice System: Architecture and Applications (cited in '223 patent prosecution)."
Although Dr. Brody's earlier statements suggest that the term "synthesized voice signals" excludes using pre-recorded human voices, the Section 112 motion and Dr. Brody's declaration do not address whether the term covers concatenated synthesis. To determine that question, the Court first *1097 looks to the intrinsic evidence. The '223 patent specification describes an inventory of questions that are addressable by number. '223 patent at 5:53-59. When one of those questions is selected, the voice generator provides signals that result in providing the caller with a "simulated voice question." Id. at 6:2-6. Thus, the specification indicates that a "simulated voice" is at least one type of "synthesized voice signal." However, that lone example does not resolve the parties' dispute.
The prior art references cited in the file history comprise the only helpful evidence. They describe concatenating different prerecorded human voices as one form of voice synthesis. As a result, this Court rules in favor of Katz and finds that the term "synthesized voice signals" covers concatenated pre-recorded voice signals. This Court does not address the two new arguments Charter raised in its reply brief because Katz did not have an opportunity to brief these issues. As a result, the Court rejects the arguments Charter raised with respect to the synthesized voice signals limitation.

d. Selectively Receiving Calls
Claim 5 requires a "means for selectively receiving calls from said multitude of terminals ... to establish telephone communication (emphasis added)." Katz argues that the ANI blocking function of Charter's CSS satisfies this limitation. However, Charter argues that the ANI blocking function cannot satisfy this limitation because ANI Blocking was part of the call flow. Since all calls entered the call flow (prior to ANI blocking), Charter concludes that CSS did not selectively receive calls.
Charter raised a variation of this argument in Section III(B)(2) (b)(ii). In that section, we concluded that Katz has provided sufficient evidence for a reasonable juror to conclude that the format does not begin until after ANI Blocking. Accordingly, this Court finds that there is a factual issue with respect to the "selectively receiving calls" limitation.

e. "Common Processing Operations"
Claim 5 also requires "means for individually cueing said callers ..., wherein at least certain of the cues and their responsive digital signals are a part of common processing operations for the plurality of call modes to isolate a sub-subset of said callers." Charter argues that Katz's expert, Dr. Kelly, failed to consider the "common processing operation" portion of this claim. Thus, Charter asks for a ruling of non-infringement for lack of evidence.
In response, Dr. Kelly now says that the "common processing operation" language is satisfied because Charter had common processing operations-providing cues and receiving digitally responsive signals. (Kelly Decl. ¶ 83.) Charter's reply brief simply asserts that Dr. Kelly's argument is new, but Charter never explains what the "common processing operations" language means and why the limitation is satisfied. This Court finds both parties' briefing lacking. Katz's argument is conclusory while Charter's is almost non-existent. With this limited record, the Court finds that Charter has failed to satisfy its burden of proof on the issue of the "common processing operations" limitation.
Based on the discussions in subsections (a)-(e), this Court DENIES Charter's motion for summary judgment as it relates to the non-infringement arguments Charter raised against claim 5 of the '223 patent.

5. Claim 1 of the '285 Patent
Charter raises four separate noninfringement arguments with respect to claim 1 of the '285 patent. Claim 1 recites:
1. An interface control system for use with, (1) a communication facility including *1098 remote terminals for individual callers, wherein said remote terminals may comprise a conventional telephone instrument including voice communication means and digital input means for providing data, (2) a multiple port, multiple format processor for interfacing a substantial number of callers in any of a plurality of formats to concurrently process data, and (3) a plurality of live operator stations with prompting capability for a plurality of formats, said interface control system comprising:
call data means for receiving signal-represented call data from said terminals including DNIS automatically provided by said telephonic communication system;

selection means coupled to said call data means for selecting one of said formats under control of said call data including DNIS to thereby further specify imposed conditions that must exist for a connection of a call either to said multiple port, multiple format processor or one of said live operator stations in accordance with said select one of said formats, at least one of said formats having at least one imposed condition; and
interconnect switch means for providing format data and controlling connections from a calling remote terminal to a port of said multiple port, multiple format processor or one of said live operator stations under control of said selection means.
(emphasis added).

a. Multiple Port, Multiple Format
Charter argues that its CSS does not infringe claim 1 because Katz has failed to identify any specific processor in Charter's CSS with multiple port, multiple format properties. This issue was considered in Section III(B)(2)(c). For the same reasons discussed in that section, this Court DENIES Charter's motion for summary judgment as it relates to the multiple port, multiple format limitation.

b. Interconnect Switch Means
Claim 1 requires an "interconnect switch means for providing format data and controlling connections from a calling remote terminal to a port of said multiple port, multiple format processor or one of said live operator stations under control of said selection means." Although the claim language discusses connections between "a remote terminal" and a "multiple port, multiple format processor" or a "live operator station," Charter says that the proper construction of this element requires that the "`switch means' be able to format data and control connections for both the multiple port processor and live operator stations." (Charter Summ. J. at p. 19-20 (emphasis in original).) Katz disagrees with Charter's claim construction and stresses the disjunctive "or" in the claim language.
Strikingly, Charter provides no support for its argument. It never even explains how the specification may impact the claim interpretation. In view of such a minimal record, this Court is unwilling to construe the claim. Rather than simply adopt Katz's claim construction, this Court DNIES Charter's motion for summary judgment for failing to present substantial evidence to support its request.

c. Selection Means
Claim 1 also recites a "selection means coupled to said call data means for selecting one of said formats." Katz says that the profile table and processor of each of the Avaya Definity G3s satisfies this limitation. However, Charter interprets the "selection means" to require a "control register" that holds "equipment signals" bits. Charter argues that Katz has failed to prove that the accused CSS include a control register with bits. As a result, Charter asks for a ruling of non-infringement. *1099 Katz disagrees with Charter's claim interpretation and argues that Charter is impermissibly importing limitations from the specification.
The parties agree that the "selection means" is a means plus function limitation governed by 35 U.S.C. § 112, ¶ 6. The construction of a means plus function limitation follows a two-step approach. First, the claimed function must be identified, staying true to the claim language and the limitations expressly recited by the claims. Next, the corresponding structures in the written description that perform those functions must be ascertained. Omega Engineering Inc. v. Raytek Corp., 334 F.3d 1314, 1321 (Fed.Cir.2003). Here the claim language indicates that the recited function is selecting one of said formats.
Although Katz argues that the specification provides several alternative embodiments, this Court's review of the specification shows it describes a single set of structures to select the format. The different embodiments Katz identifies merely reflect additional details regarding the same embodiment. This Court finds that the structures that select the format are the control unit 66, including the control register 70 and look-up table 84. See '285 patent at 8:54-60 ("Generally, the control unit 66 implements specific formats which may involve coupling a caller either to a live operator station OS1-OSn or to the processor P. In that regard, the control unit 66 provides a series of timing signals tl-t6 to sequence the operations of individual component blocks as illustrated."); id. at 8:68-9:2 ("The control register 70 receives format control words specified, as by the called number and having a form as illustrated in FIG. 4."); id. at 6:58-61 ("the fetched control word of the block 36 prompts an inquiry as to the conditions attendant the selected operating format as indicated by a query block 38."); id. at 10:31-34 ("the first sixteen bits comprise the format control word and are provided from a look-up table 84 (FIG. 3, right, central) upon being addressed by call data from the register 64."). The Court does not include the "equipment signal" bits in its construction because Charter has failed to show that those bits are clearly linked to recited function.
Even though Katz's infringement contentions have not specifically identified a control register in the processor of each of the Avaya Definity G3s, this Court is cognizant that: 1) this decision just ruled that a "control register" is part of the proper interpretation of selection means; 2) control registers are a common feature of most processors; and 3) Charter's evidence does not show that the accused processors do not have a control register. Thus, Katz may identify a control register if it can. Alternatively, a reasonable jury could still find that the processor in an Avaya Definity G3s is equivalent to the '285 patent's control unit 66 including the control register 70. Accordingly, this Court DENIES Charter's motion for summary judgment with respect to the "selection means" limitation.

d. Multiple Formats
Claim 1 of the '285 patent also requires a "plurality of formats." As discussed earlier, Charter argues that its CSS does not have multiple formats. This Court DENIES Charter's motion for summary judgment for the reasons discussed in Section III(B)(2)(a).

6. Claim 2 of the '415 Patent
Charter raises two separate non-infringement arguments with respect to claim 2 of the '415 patent. Claim 2 depends from independent claim 1. Together these claims recite:
1. A process for determining the acceptability of calls and executing formats in association with a communication facility *1100 including remote terminal apparatus for individual callers, wherein said remote terminal apparatus includes a telephonic instrument with voice communication means and digital input means in the form of an array of alphabetic, numeric buttons for providing data, said process including the steps of: receiving associated telephone number signals upon the instance of a call from one of said remote terminal apparatus; testing said associated telephone number signals with respect to stored negative data to determine the acceptability of said call from said one of said remote terminal apparatus as indicated by an acceptability signal;
accepting said call from said one of said remote terminal apparatus conditioned on said acceptability signal;
interfacing via said communication facility to accepted calls to provide voice signals for cueing callers and receiving responsive digital data in accordance with a select format; and
testing at least certain of the responsive digital data against stored positive data to determine if further voice signals for cueing callers should be provided.
2. A process according to claim 1 wherein said step of receiving associated telephone number signals includes receiving data represented by number identification signals provided automatically by said communication facility to indicate called or calling numbers.
(emphasis added).

a. "Associated Telephone Number Signals"
Claim 1 requires that Charter "test[] said associated telephone number signals...," and dependent claim 415:2 requires "said step of receiving associated telephone number signals includes receiving data represented by number identification signals provided automatically by said communication facility to indicate called or calling numbers." Once again, Charter contends that testing of both calling and called number signals is required while Katz argues that only testing of ANI or DNIS is required. Charter's reasoning is that if the "associated telephone number signals" in claim 1 "did not encompass both calling and called numbers, claim 2 would impermissibly broaden, not narrow, the scope of claim 1." (Charter Summ. J. at 22-23.)
Charter's argument is flawed for two reasons. "First, the term "associated number signals" must not be read in a vacuum. The addition of the phrase "called or calling numbers" in the claim is not the only possible narrowing language. Claim 2 adds the steps of receiving data represented by number identification signals provided automatically ..." (emphasis added). Read together, these claims simply require that some type of telephone number signal (e.g., ANI) be received and tested against stored negative data and, in addition, that the receiving step include automatically-provided data indicating called or calling numbers. Thus, dependant claim 2 is different from the independent claim 1 because the number identification signals must be provided automatically.
Second, Charter's reasoning is illogicalrequiring both ANI and DNIS for claim 1 would be more restrictive and, as such, would render it more narrowly. Moreover, Charter is ignoring the plain language of the claims by reading "or" to mean "and." As a result, this Court rejects Charter's construction. Since it is undisputed that there is substantial evidence that Charter's CSS tested callers' ANIs, this Court DENIES Charter motion for summary judgment as it relates to the "associated telephone number signals" limitation.

*1101 b. "Testing ... to Determine the Acceptability of Said Calls"
Claim 1 also requires "testing said associated telephone number signals with respect to stored negative data to determine the acceptability of said calls...." Charter argues that it does not meet this limitation because it "accepted all calls," before testing the calling number and performing ANI blocking. Charter raised a variation of this argument in Section III(B)(1)(b)(ii). In that section, we concluded that Katz has provided sufficient evidence for a reasonable juror to conclude that the format does not begin until after ANI blocking. Accordingly, this Court DENIES Charter's motion for summary judgment as it relates to the arguments raised here.

7. Claim 129 of the '707 patent
Charter raises four separate noninfringement arguments with respect to Claim 129 of the '707 patent. Claim 129 depends on claim 128 which depends from independent claim 96. Together these claims recite:
96. An analysis control system for use with a communication facility including remote terminals for individual callers, wherein each of said remote terminals may comprise a conventional telephone instrument including voice communication means and digital input means in the form of an array of alphabetic numeric buttons for providing data and wherein said communication facility has a capability to provide call data signals indicative of calling number identification data for at least certain of said individual callers, said analysis control system comprising:
interface structure coupled to said communication facility to interface each of said remote terminals for voice and digital communication, and including means to provide signals representative of data developed by said remote terminals and for receiving said calling number identification data;

voice generator structure coupled through said interface structure for actuating said remote terminals as to provide vocal operating instructions to said individual callers;
record structure, including memory and control means, connected to said interface structure for accessing a file and storing data relating to certain select ones of said individual callers in accordance with said calling number identification data;
qualification structure controlled by said record structure for controlling access to said system by said individual callers; and
means for processing at least certain of said data developed by said terminals and said calling number identification data relating to certain select ones of said individual callers.
128. A system according to claim 96, further comprising:
a data base for storing unacceptable numbers as negative file data.

129. A system according to claim 128, wherein said qualification structure further executes a test for unacceptable numbers based upon said data developed by said terminals.

(emphasis added).

a. Voice Generator
Claim 129 requires a "voice generator structure ... to provide vocal operating instructions to said individual callers."[3] Charter advances the same interpretation for this term as it did for "synthesized voice signals." Specifically, Charter argues that it requires a simulated voice, not human recorded voice. Charter contends *1102 that its system uses a human voice. Therefore, it does not infringe claim 129.
This Court rejects Charter's analysis for two reasons. First, there is nothing in the claim language quoted above to restrict it to a simulated voice. Second, Katz has presented evidence that Charter concatenates human voices. Therefore, even if some synthesis was required, there is evidence to suggest infringement. Accordingly, this Court DENIES Charter's motion for summary judgment as it relates to the voice generator limitation.

b. Negative File Data
Claim 129 requires "a database for storing unacceptable numbers as negative file data." The Court construed "negative file data" as "a file containing a list of invalid numbers that are used to compare against numbers associated with specific callers." (February 21, 2008 Claim Construction Order at p. 38.) Katz argues that this limitation is satisfied by the Operational Data Store ("ODS") in Charter's CSS. The ODS contains a list of telephone numbers with flags. One flag indicates whether the number is associated with an account that has a past due balance.
Charter argues the ODS does not satisfy the "negative file data" limitation for four reasons. First, Charter argues that "negative file data" is "a file that contains only negative data." (Charter Summ. J. at p. 23 (emphasis in original).) Since ODS contained other information (not just a list of delinquent accounts), Charter argues that it does qualify as negative file data. This Court rejects Charter's argument. The relevant inquiry is whether the negative file data contains a list of invalid numbers. The fact that it may contain additional information is irrelevant.
Second, Charter argues that the same list of telephone numbers cannot satisfy both the "positive data" and "negative file data" limitation because these terms have different scopes. However, Dr. Kelly actually stated "[t]here is data in the ODS table that is negative data and there is data in the ODS table that is positive data." (June 27, 2008 Kelly Dep. at pp. 155.) The testimony suggests that Dr. Kelly was talking about different parts of the same table. Moreover, even if Charter's characterization was correct, the same structure can satisfy two distinct limitations.
Third, Charter argues that the numbers in question are not "unacceptable" because calls associated with these numbers were still accessing the system as part of the test. Under Charter's interpretation of "unacceptable," a number that is tested cannot be considered "unacceptable" by virtue of the fact that it is already being connected to the system. This Court rejects this interpretation because it would render the claim inoperative.
Fourth, Charter argues that the numbers in question were not "unacceptable" because the calls were still handled by an agent. However, these calls were not permitted to access the main menu of Charter's system. A jury could reasonably conclude that these calls were "unacceptable."
Accordingly, this Court DENIES Charter's motion for summary judgment as it relates to the "negative file data" limitation.

c. "Means for Processing ..."
Claim 129 also requires a "means for processing at least certain of said data developed by said terminals and said calling number identification data relating to certain select ones of said individual callers." Previously, this Court determined that the specification disclosed three alternative structures: the mini-computer 92, Centrum 9000 or Interface 20 that performed the recited function of the processing means. (August 29, 2008 Section 112 Order at pp. 58-59.) Charter argues that Katz has only identified a general purpose *1103 processor and that this allegation is insufficient because the '707 patent failed to disclose an algorithm. As a result, Charter asks the Court to grant it summary judgment of non-infringement.
Katz disagrees with Charter on the facts and says it did not identify a general purpose processor. Rather, its expert, Dr. Kelly, identified the processor of the DCC IVRs and a processor of the Avaya IC. (Kelly Decl. ¶ 117.) Dr. Kelly's common report stated that these structures were identical or at least equivalent to the processing unit 92, interface 20 or Centrum 9000 "because they perform the claim function of processing caller supplied data and ANI ... by receiving and performing operation on data signals related to the callers by executing a set of instructions...." (Kelly Decl. ¶ 118.) Finally, Dr. Kelly concludes that the processor of the Avaya IC processed the ANI, and the processor of the DCC IVR processed data developed by the terminals, e.g., payment information entered by the caller. (Kelly Decl. ¶ 119.)
This Court finds a factual issue as to whether the accused structures are the same or equivalent to the interface 20 or Centrum 9000, but not processing unit 92. Regardless, if the accused processors are general purpose processors, Katz may accuse them of infringement. The failure of the '707 patent specification to disclose an algorithm only affects the interpretation of the means plus function limitation. Specifically, one of the three alternative structures, the minicomputer unit 92 (i.e. processing unit), disclosed by the specification is a general purpose processor that requires a corresponding algorithm under WMS Gaming, supra. Since the specification does not disclose an algorithm, that alternative was not disclosed in sufficient detail (i.e. is indefinite) and cannot be used to prove infringement. However, the other two structures, namely the interface 20 and Centrum 9000, are not general purpose processors. Thus, they do not require any algorithm to comply with the definiteness requirement.
In sum, the jury is entitled to consider whether the accused processor of the DCC IVRs and processor of the Avaya IC satisfy the "means for processing" limitation. Accordingly, this Court DENIES Charter's motion for summary judgment with respect to that limitation.

d. "Means for Providing ... and for Receiving"
Claim 129 also requires a "means to provide signals representative of data developed by said remote terminals and for receiving said calling number identification data." Charter argues that its CSS does not satisfy this limitation for essentially the same reasons it raised with respect to the "means for providing identification signals entered by said callers of said select subset" limitation of claim 5 of the '223 patent. For the reasons discussed in Section III(B)(4)(a), this Court DENIES Charter's motion for summary judgment with respect to the "means for providing... and for receiving" limitation.

8. Claims 30, 45 and 67 of the '762 Patent
Charter argues it does not infringe claims 30, 45 and 67 of the '762 patent for five separate reasons. Claim 30 of the '762 patent depends from independent claim 17. Claims 45 and 67 depend from independent claim 41.[4] Together these claims recite:

*1104 17. An analysis control system for use in a mail order facility or the like, said analysis control system for use with a communication facility including remote terminals for individual callers, wherein each of said remote terminals comprises voice communication means and digital input means in the form of an array of buttons for providing data, comprising: interface structure coupled to said communication facility to interface said remote terminals for voice and digital communication and including means to provide answer data signals provided by said individual callers from said remote terminals including signals indicative of an individual caller's customer number and credit card number;

credit verification structure to verify said individual caller's customer number and credit card number to determine said individual caller's credit;
record structure including memory and control means connected to said interface structure to receive and store data provided by said individual callers;
acknowledgement generator structure for providing a computer generated acknowledgement number to said individual callers;
switching structure for transferring certain of said individual callers to a live operator; and
central processing station coupled to said record structure to receive data on said individual callers.
30. An analysis control system according to claim 17, wherein said communication facility automatically provides signals indicative of calling terminal digital data for at least certain of said individual callers.
41. An analysis control system for use in a mail order facility or the like, said analysis control system for use with a communication facility including remote terminals for individual callers, wherein each of said remote terminals comprises voice communication means and digital input means in the form of an array of buttons for providing data, comprising: interface structure coupled to said communication facility to interface said remote terminals for voice and digital communication and including means to provide answer data signals provided by said individual callers from said remote terminals including signals indicative of an individual caller's customer number;

credit verification structure to verify online said individual caller's customer number to determine said individual caller's credit;
record structure including memory and control means connected to said interface structure to receive and store data provided by said individual callers;
acknowledgement generator structure for providing a computer generated acknowledgement number to said individual callers;
switching structure for transferring certain of said individual callers to a live operator; and
central processing station coupled to said record structure to receive accumulated data on said individual callers.
45. An analysis control system according to claim 41, wherein said credit verification structure additionally verifies said individual caller's credit card number.
67. An analysis control system according to claim 41, wherein said interface structure receives calling digital data provided automatically by said communication facility indicative of said individual caller's telephone number.
(emphasis added).

a. "Acknowledgement Number"
Claims 30, 45 and 67 all require a "computer generated acknowledgement number." *1105 Katz says that Charter's CSS uses an acknowledgment generator structure when it provides payment confirmation numbers for credit card payments. (Kelly Decl. ¶ 130.) This Court previously construed an "acknowledgment number" to mean "a number used by a caller to verify or acknowledge a transaction to the system." (Claim Construction Order at p. 8.) Charter raises three separate non-infringement arguments. First, Charter highlights the term "used by a caller" in the Court's definition and argues that its confirmation numbers do not qualify as "acknowledgement numbers" because there is no evidence that a caller could input a number to verify or acknowledge a transaction. Second, Charter argues there is no evidence that callers actually used the numbers to verify or acknowledge a transaction. Finally, Charter argues that the structures that were responsible for providing acknowledgment numbers were owned by third party entities that were not under the direction or control of Charter. Thus, relying on Muniauction Inc. v. Thomson Corp., 532 F.3d 1318 (Fed.Cir. 2008), Charter concludes it could not directly infringe claim 30, 45 and 67.
Charter's first argument assumes that the claims require the caller to input the acknowledgment numbers directly into the system. This issue was not raised during the claim construction briefing, and the Court certainly did not intend to address this issue when it drafted its definition. A review of the '762 patent specification shows at least two relevant descriptions of an acknowledgment number. '762 patent at 7:59-9:2 and 11:50-58. In one example, the caller repeats the acknowledgment number to the system. However, in the second example, the specification merely states that "[t]he acknowledgement digits serve to identify the order both for the caller and the mail-order house. Accordingly, tracing is facilitated." Id. at 11:53-58. This Court must walk the fine line of using the specification to interpret the meaning of a claim without importing limitations from the specification into the claim. See Phillips v. AWH Corp., 415 F.3d 1303, 1323 (Fed.Cir.2005). In this Court's judgment, there is nothing within the specification or the term itself that requires an acknowledgment number to be provided to the system. Accordingly, this Court rejects Charter's first argument.
Next, Charter argues Katz does not have sufficient evidence to show that any acknowledgment numbers are actually used. However, Katz has provided evidence that Charter's system provides a form of acknowledgment number as part of a credit card transaction. Charter's documentation and witnesses label this number a "confirmation number." (Kelly Decl. ¶ 131 and citations therein.) Surprisingly, both parties' briefing fails to provide a detailed description of how the "confirmation number" is used. Certainly, if Charter did not use the number to acknowledge or verify a transaction, Charter should be in a good position establish that fact. Given this record, a jury could rely on the circumstantial evidence and reasonably conclude that the confirmation numbers were used to verify or acknowledge a transaction. Thus, there appears to be a substantial factual issue for the jury.
Finally, Charter argues that it does not control or direct the entities that own and operate the components accused of providing the acknowledgement number. In support of this position, Charter merely cites to its statement of undisputed facts, which in turn cites to a number of exhibits. Although Katz's opposition is also conclusory, its Statement of Genuine Issues lists a number of factors that suggest that Charter actually directed or controlled the third parties. (Katz's Statement of Genuine Issues Re: Charter at ¶ 218.) Accordingly, this Court DENIES Charter's motion *1106 for summary judgment as it relates to direction and control.[5]

b. "Credit Verification Structure"
Claims 30, 45 and 67 also require a "credit verification structure to verify said individual caller's customer number and credit card number to determine said individual caller's credit." Charter raises three separate non-infringement arguments with respect to this limitation. First, Charter argues that its CSS did not have a structure that performed the functions of a credit verification structure. Second, Charter argues that using the caller's customer number to access the caller's account information and check the caller's account balance and overdue status is not verification of the caller's credit. Finally, Charter argues that it did not control or direct the vendors that performed various accused functions.
This Court rejects each of Charter's arguments. First, Katz has identified several credit verification structures"Avaya IC, CTIDATA database, CSG billing system, ICOMS billing system, and third party payment processing company." (Katz Opp'n to Charter Summ. J. at p. 24) Whether these structures actually satisfy the limitation is a factual issue for the jury. Second, Charter's claim construction is inconsistent with the specification. Katz correctly points out that the specification discloses the operations that Charter believes are not covered by the claims. See '762 patent at 11:26-33. Third, as discussed in the preceding subsection, this Court finds that there is a factual issue over direction or control. Accordingly, this Court DENIES Charter's motion for summary judgment as it relates to the credit verification structure limitation.

c. "Synthesized Voice"
Section V(F)(4) of Charter's motion for summary judgment is entitled "Charter's CSS Did Not Used Synthesized Voice." However, the body of the section recites to the "acknowledgment generator structure," which does not mention anything about "synthesized voice." It also refers to Section V(B)(3) of its motion. This Court previously rejected the arguments raised in that section. This Court likewise DENIES Charter's motion for summary judgment with respect to any arguments raised in Section V(F)(4) for failing to clearly set out the basis for Charter's position.

d. Central Processing Station
Claims 30, 45 and 67 also require a "central processing station." Charter says that Katz's expert, Dr. Brody, admitted that a central processing limitation must be centrally located. Thus, Charter argues that the accused DCC IVRs cannot satisfy this limitation. However, Charter fails to identify any intrinsic evidence that supports its claim construction, or provide evidence showing the location of the DCC IVRs. Accordingly, Charter's arguments are not sufficiently developed for this Court to make a ruling. Based on the foregoing, this Court DENIES Charter's motion for summary judgment with respect to the central processing station limitation.

e. "Means to Provide Answer Data Signals"
Claims 30, 45 and 67 also require a "means to provide answer data signals." *1107 For essentially the same reasons discussed in Section III(B)(4)(a), Charter argues that CSS does not satisfy this limitation. This Court DENIES Charter's motion for summary judgment with respect to the "means to provide answer data signals" limitation for the reasons discussed in that section.

9. Evidence that CSS Actually Performed the Methods
Charter claims that Dr. Kelly did not assert or cite evidence that Charter actually performed the steps for method claims (claim 2 of the '415 patent, and claims 10 and 11 of the '150 patent). While a finding of infringement of a method claim requires proof that the accused infringer performed the claimed method, direct evidence is not necessary. Moleculon Research Corp. v. CBS, Inc., 793 F.2d 1261 (Fed.Cir.1986). In Moleculon Research, the defendant argued that it could not be liable for inducement because there was insufficient evidence that its customers directly infringed the method claim. The Federal Circuit rejected the argument and held circumstantial evidence of sales data and documents was sufficient to support a judgment of infringement of method claims. Moleculon Research, 793 F.2d at 1272. Indeed, this Court itself stated that "flow charts and other evidence" submitted by Katz in the Verizon case were circumstantial evidence that the claimed method was actually used. (Order Re Verizon's Motion for Summary Judgment and Katz's Motion for Summary Judgment (12/3/2003) at 75-76.) Here, Dr. Kelly cited to evidence comprising circumstantial evidence that Charter performed the claimed methods. (See Kelly Charter Report at Ex. Charter-2 and Charter-5 attached Ex. B to Kelly Decl.) For claims 10 and 11 of the '150 patent, Dr. Kelly cited to call flows, structural diagrams, and usage reports. Similarly, for claim 2 of the '415 patent, Dr. Kelly cited to various documents.
Thus, this Court finds there is a factual issue as to whether the Charter systems actually performed the steps suggested in these documents.[6] Accordingly, this Court DENIES Charter's motion for summary judgment with respect to the issues raised in this section.

10. Means Plus Function Limitations Involving a Processor
Charter points out that a number of claims contain means plus function limitations that are subject to WMS Gaming. Those claims are:
1. claim 5 of the '223 patent, which recites a "means for individually cueing,"
2. claim 1 of the '285 patent, which recites a "selection means," and
3. claims 30, 45 and 67 of the '762, which recite an "acknowledgment generator structure."
Charter argues that Katz has failed to identify an algorithm in the specifications that corresponds to the recited functions. As a result, Charter asks for findings of non-infringement. These arguments are simply the same § 112 arguments that the Court struck from Charter's motion. As a result, this Court will not address those arguments.

C. Laches
Charter also moved for summary judgment on the issue of laches. This Court addresses that issue together with Katz's motion for summary judgment on laches.

*1108 D. Damages

1. After 2005
The nine remaining claims asserted against Charter expire no later than July 10, 2005 or December 20, 2005. However, Katz's damages expert, James Malackowski, calculated damages until 2009, four years beyond the latest expiration date of the asserted claims.
In response, Katz argues that the "`unselected' claims may give rise to damages in this period." (Katz's Opp'n to Summ. J. at p. 30.) Katz raises two arguments in support of this position. First, Katz points out that the Court limited the number of claims it could assert. As a result, Katz argues that its due process rights would be violated if it were not allowed to collect damages for the entire term of its patent portfolio. Katz's argument might make sense if this Court only allowed Katz to select a representative sample of claims. That is not the case. This Court's limits were intended to prevent litigation of duplicative claims. It was not intended to curtail any of Katz's rights, nor were the limits absolute. This Court specifically invited Katz to file a motion to exceed the limits, provided Katz could justify each additional claim. Katz could have sought to add claims by explaining that they covered the same accused services, but had different terms. Katz did not do so. Accordingly, this Court rejects Katz's due process argument.
Second, Katz argues that there is sufficient evidence to suggest that in a hypothetical negotiation, the parties would have agreed to a portfolio license that included all of Katz's patents. However, Katz frames the negotiation incorrectly. The hypothetical negotiation can only concern the patents currently at issue. When that assumption is made, Katz's argument collapses.
Accordingly, this Court GRANTS Charter's motion and finds that Katz may not recover damages for any activity after the expiration of the latest asserted patents December 20, 2005.

2. Non-Accused Systems
Charter says that Katz has only provided infringement contentions with respect to CSS or "Charter's Customer Services." As a result, Charter asks the Court to declare that Katz cannot recover damages from Charter for any services other than the CSS. In response, Katz says that it "does not seek damages for infringement by Charter systems other than customer service." (Katz Charter Opp'n to Summ. J. at p. 31.) Nonetheless, Katz argues that the Court should not grant summary judgment because "those systems may be infringed by Katz's unselected claims." (Katz AOL Opp'n to Summ. J. at p. 31 (emphasis added).) To survive Charter's motion, Katz has the burden of identifying some evidence that would allow a jury to conclude that Katz should collect damages. Here, Katz does not even argue that it is entitled to damages. As discussed in other portions of this decision and various other Court orders, Katz may no longer raise the "unselected claims." Accordingly, this Court GRANTS Charter's motion for summary judgment and finds that Katz may not recover damages for any infringement by any non-CSS service.

IV. KATZ'S MOTION FOR SUMMARY JUDGMENT
Katz also filed one summary judgment motion against all the defendants including Charter. The motion covers four substantive areas: 1) infringement, 2) estoppel, 3) laches, and 4) prosecution laches. In Section III(B)(3), this decision addressed Katz's infringement request. The sections relating to the remaining three affirmative defenses are found below.

*1109 A. Equitable Estoppel
The defendants have all pled the affirmative defense of equitable estoppel. Equitable estoppel comes into play when a patent owner represents to an infringer, expressly or implicitly, that he will not enforce his patent against the infringer's business, and the infringer relies on that representation. The Federal Circuit has stated that there are three elements to equitable estoppel: a) the patentee, through misleading conduct, leads the alleged infringer to reasonably infer that the patentee does not intend to enforce its patent against the alleged infringer; b) the alleged infringer relies on that conduct; and c) due to its reliance, the alleged infringer will be materially prejudiced if the patentee is allowed to proceed with its claim. See A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020, 1028 (Fed.Cir.1992). Equitable estoppel must be shown by a preponderance of the evidence. Id. at 1046.
Katz argues that the defendants cannot prove either element. As to misleading conduct, Katz argues that its communications were truthful and straightforward.
... in the years prior to filing suit Katz maintained a steady stream of communications with the defendants, in which it made repeated offers to license the Katz patent portfolio. During this time, Katz also informed the defendants that it was in the midst of ongoing patent litigation and might not be in contact as frequently as it would otherwise, but that the defendants should not interpret any delay or lack of communication to mean that Katz did not intend to "resolv[e][the] matter."
(Katz Mot. for Summ. J. at p. 14.) Based on these communications, Katz concludes that the defendants could not have been misled by its failure to sue them earlier.
Here, Charter fails to point to any other factor indicating that the silence was misleading. Indeed, all the evidence suggests that Katz would continue to pursue the defendants. Katz sent a series of letters over the course of many years aimed at persuading each of the defendants including Charter to take a license. The letters described Katz's litigations. This conduct plainly suggests that Katz was serially pursuing different targets, and each defendant's turn would come. Thus, the Court finds that the defendants have failed to raise a genuine issue of material fact with respect to misleading conduct. Accordingly, this Court GRANTS Katz's motion for summary judgment as to equitable estoppel. Given this Court's finding regarding misleading conduct, it is unnecessary to address the issue of reliance.

B. Laches
Katz's motion for summary judgment seeks to eliminate the defendants' affirmative defense of laches. Charter also filed a motion for summary judgment seeking to establish laches.

1. Legal StandardLaches
Laches occurs when a plaintiff unreasonably delays in bringing suit on its patent. The defense bars a patentee from recovering damages accrued prior to the filing of a lawsuit. A.C. Aukerman, 960 F.2d at 1041. The elements of laches are: "(1) the plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant, and (2) the delay operated to the prejudice or injury of the defendant." Id. at 1032. Laches must be established by a preponderance of the evidence. Id. at 1045.

*1110 2. Unreasonable Delay
Katz asks the Court to find that any delay in filing suit against the defendants was not "unreasonable and inexcusable." In support of this argument Katz relies on 1) the licensing discussions Katz had with the defendants, 2) licensing discussions Katz had with other entities, and 3) the multiple lawsuits Katz brought against other entities.
There is a rebuttable presumption that laches applies if the delay in bringing a lawsuit is over six years. Id. at 1035. The plaintiff can puncture the presumption with introduction of evidence sufficient to raise a genuine dispute as to either delay or prejudice. Hemstreet v. Computer Entry Sys. Corp., 972 F.2d 1290, 1293 (Fed. Cir.1992). Courts have recognized both litigation and negotiations with the accused as an excuse for delay. Aukerman, 960 F.2d at 1033 (citations omitted). Once the presumption is burst, the defendant must affirmatively prove both elements of laches. Hemstreet, 972 F.2d at 1293 (citing to Aukerman, 960 F.2d at 1032).
The presumption of laches applies only to seven of the nine asserted claims: claim 1 of the '285 patent, claims 10 and 11 of the '150 patent, claim 129 of the '707 patent, and claims 30, 45 and 67 of the '762 patent. The presumption of laches does not apply to claim 4 of the '223 patent or claim 2 of the '415 patent because the current lawsuit was filed within six years of the date that these two patents issued.[7]
Here, the parties dispute whether Katz's litigations and negotiations raise a genuine issue of excuse. First, Charter argues that its negotiations with Katz were sporadic and did not progress with a fair chance of success. Early laches decisions state that, for license negotiations to serve as an excuse, the negotiation must "ordinarily be continuous and bilaterally progressing, with a fair chance of success, so as to justify significant delays." A.C. Aukerman Co. v. Miller Formless Co., Inc., 693 F.2d 697, 700 (7th Cir.1982); see Continental Coatings Corp. v. Metco, Inc., 464 F.2d 1375, 1377-78 (7th Cir.1972).
Katz contacted Charter beginning by at least November 13, 1996 regarding its patent portfolio. (Tcheng Decl. Ex. 12.) Subsequently, Katz sent additional letters on March 31, 1997, May 22, 1998, January 15, 1999, and December 16, 1999. Id. Charter asked for additional information regarding any potential infringement on June 12, 2000. Id. The parties continued to engage in correspondence and actually met on April 18, 2001. Id. Subsequent correspondence in 2001 and 2002 appear to indicate that Charter was seriously evaluating Katz's portfolio and the possibility of taking a license. Id. Finally, on June 13, 2002, Charter wrote Katz a letter indicating that Charter had completed its evaluation and concluded that it does not require a license under any of the claims in Katz's portfolio. Subsequently, Katz sent Charter additional letters offering a license.
Charter argues that the negotiations cannot establish excusable delay because the correspondence was "sporadic" and Charter expressly informed Katz that it had no interest in a license. This Court rejects Charter's argument because the correspondence clearly suggests that negotiations were bilateral and had a fair *1111 chance of success up until June 13, 2002. After that date, there is no basis for arguing that the negotiations "excuse" further delay.
But, Katz also relies on other lawsuits and negotiations to excuse its delay. Katz was involved in two major patent litigations between 1995-2006, the AT & T litigation (1997-2000) and the Verizon litigation (2001-2004). Citing to the current multidistrict litigation, Charter argues that the litigation excuse should not apply because Katz had the resources to pursue multiple parties simultaneously. Charter also points out that at one point in 2000, Katz was not in litigation with any party. Again, this Court finds Charter's argument unpersuasive. First, this Court has already established that Katz may attempt to rely on negotiations to excuse its delay up until June 13, 2002. Second, even if Katz had the resources to engage in multiple simultaneous litigations, this fact does not mean that Katz cannot attempt to use the litigation excuse. A party may reasonably choose to focus its attention on one lawsuit even when it can engage in many.
Accordingly, this Court finds that there are genuine issues of fact with respect to the excuses Katz has raised. This finding has several effects. First, the presumption of laches is burst and the defendants have the burden to prove their defense. Second, since Charter has failed to prove that Katz's delay in bringing suit was unreasonable, this Court will not rule that laches applies as a matter of law and DENIES Charter's motion for summary judgment. Finally, since Katz has failed to prove that its delay was reasonable as a matter of law, this Court cannot dismiss the defendants' laches defense based on this argument.

3. Prejudice
The second element of laches is prejudice. Katz's motion for summary judgment also argues that the defendants have failed to provide any evidence of prejudice. In response, Charter alleges both evidentiary and economic prejudice.

a. Evidentiary Prejudice
Charter argues that Mr. Katz's failure to recall certain events is prejudicial. In particular, Charter argues that Mr. Katz could not recall information related to earlier investigations of Charter, relevant activities on the part of Charter, and even meetings with Charter. In addition, Charter says that Mr. Katz could not testify as to those features he allegedly invented or the prosecution of his patents. Finally, Charter says that due to the passage of time and employee attrition, its witnesses were unable to testify regarding the operation of certain "formats" and whether certain proposals were actually implemented.
In response, Katz argues that Charter has not demonstrated that its ability to present a defense has been prejudiced by the evidence that has been supposedly lost. This Court agrees. Although Charter generally discusses evidence that is no longer available, it never explains why this evidence is important to its case, or discusses why the same facts cannot be otherwise proved. As a result, this Court finds that Charter has failed to present substantial evidence of evidentiary prejudice.

b. Economic Prejudice
Charter argues that it also suffered economic prejudice. Specifically, Charter says that it made material changes to its call center operations. These investments "may not" have been made had Katz filed suit earlier.
In response, Katz argues that the defendants have failed to link the defendants' decision to make new investments with Katz's failure to promptly sue. In Meyers v. Brooks Shoe, Inc., 912 F.2d 1459, 1463 n. 1 (Fed.Cir.1990), the Federal Circuit *1112 stated that to prevail on laches, the defendants "must show that the prejudice they suffered resulted from the delay." In Meyers, none of the defendants submitted evidence that they curtailed design and development of the accused products in response to suit once it was actually filed. Id. at 1463. The evidence also failed to show that the defendants were concerned that their products might infringe the patents or that they would have acted differently had they been sued earlier. Id. As a result, the Federal Circuit reversed the district court's decision to grant the defendants' summary judgment on laches. Here, Charter has also failed to present any evidence that suggests that its decisions would have been different had Katz sued earlier. Accordingly, this Court finds that Charter has failed to present substantial evidence on economic prejudice.
Since this Court finds that Charter has failed to present substantial evidence of both evidentiary and economic prejudice, this Court GRANTS Katz's motion for summary judgment as to Charter's affirmative defense of laches.

C. Prosecution History Laches
Katz's summary judgment motion also asks this Court to dismiss the defendants' affirmative defense of prosecution laches. The equitable doctrine of prosecution laches may bar enforcement of patent claims issuing after an unreasonable and unexplained delay in prosecution, even though the applicant complied with pertinent statutes and rules. Symbol Techs., Inc. v. Lemelson Med., Educ. & Research Found., 277 F.3d 1361, 1363 (Fed.Cir.2002) (hereinafter "Symbol I").

1. Legal StandardProsecution Laches
In Symbol I, the Federal Circuit did not issue any "firm guidelines" for determining when laches exists. Symbol Techs., Inc. v. Lemelson Med., Educ. & Research Found., 422 F.3d 1378 (Fed.Cir.2005) (hereinafter "Symbol II"). All the parties agree that prosecution laches requires an unreasonable and unexplained delay in the prosecution of a patent. However, they disagree about whether intervening adverse rights is also a requisite element. Katz argues that intervening rights is an essential element of the defense, while the defendants argue that it is simply one factor to be considered in a totality of circumstances determination.
In support of its position, Katz cites to Crown Cork & Seal Co. v. Ferdinand Gutmann Co., 304 U.S. 159, 167-68, 58 S.Ct. 842, 82 L.Ed. 1265 (1938) and General Talking Pictures Corp. v. Western Electric Co., 304 U.S. 175, 183, 58 S.Ct. 849, 82 L.Ed. 1273 (1938), and argues that these Supreme Court decisions hold that prosecution laches does not apply in the absence of intervening rights. Katz also points out that the Federal Circuit relied, in part, on these decisions to revive the doctrine of prosecution laches. Symbol I, 277 F.3d at 1365. Therefore, Katz concludes that the intervening rights requirement remains intact. Finally, Katz points out that this Court arrived at the same conclusion in an earlier decision. See Verizon California Inc. v. Ronald A. Katz Technology Licensing, L.P., No. 01-CV9871 (RGK)(RCx), 2003 WL 25761597, at *22, 2003 U.S. Dist. LEXIS 23553, at *62-63 (C.D.Cal. Dec. 2, 2003) ("it appears that proof of `intervening adverse public rights' is a requisite element of a successful prosecution laches defense").
In response, Charter argues that although "intervening public or private rights" could be a factor in evaluating the totality of circumstances, the Federal Circuit has never required the presence of intervening rights. See Symbol II, 422 F.3d at 1382 (citing intervening rights as additional factual considerations); see also In re Bogese II, 303 F.3d 1362, 1367 (Fed. *1113 Cir.2002) (affirming Board of Patent Appeal's forfeiture of patent based upon prosecution laches without requirement of intervening rights); Reiffin v. Microsoft Corp., 270 F.Supp.2d 1132, 1154 (N.D.Cal. 2003) ("the demonstration of unreasonable and unexplained delay [is] the sole element of the defense of prosecution laches.")
After reviewing the decisions, this Court concludes that Katz is correct and that the Supreme Court has addressed the issue of intervening rights. In both Crown Cork and General Talking Pictures, the Supreme Court held that prosecution laches would not apply absent intervening adverse rights. Crown Cork, 304 U.S. at 167, 58 S.Ct. 842 ("It is clear that, in the absence of intervening adverse rights, the decision in Webster Electric Co. v. Splitdorf Co., supra [264 U.S. 463, 44 S.Ct. 342, 68 L.Ed. 792 (1924) ] does not mean that an excuse, must be shown for a lapse of more than two years in presenting the divisional application"); General Talking Pictures, 304 U.S. at 183, 58 S.Ct. 849 ("In the absence of intervening adverse rights for more than two years prior to the continuation applications, they were in time.") Although the precedent is old, it is controlling. Therefore, this Court likewise finds that to prevail on a claim of prosecution laches, the defendant most prove both: 1) unreasonable and unexplained delay, and 2) intervening adverse rights.

2. Unreasonable Delay
Katz's summary judgment motion argues that the defendants do not have evidence of unreasonable delay. However, Charter offers the expert report of Professor Wagner that compares the pendency of Katz's patents against other patents prosecuted during the same time period. The report shows that almost all the asserted patentsspecifically the '707, '285, '762, '223 and '415 patents, but excluding the '150 patenthave priority pendencies that were longer than 97% of other patents. These delays are certainly significant and might provide a basis for finding prosecution laches.
The question revolves on whether Katz can provide a reasonable explanation for that delay. Katz's motion argues that it was diligent and hastened the issue of patents by having at least one patent issue between 1988 and 2004. Moreover, Katz points out that it filed terminal disclaimers in connection with nearly all of its patents. See Chiron Corp. v. Genentech, Inc., 268 F.Supp.2d 1139, 1143 (E.D.Cal.2002) (filing of a terminal disclaimer "may weigh strongly in favor of finding the delay is reasonable"). However, Charter challenges the reasonableness of Katz's explanations. With all of the evidence in mind, this Court finds that there is a genuine issue of material fact with respect to the issue of unreasonable and unexplained delay.

3. Intervening Adverse Rights
Despite arguing that prosecution laches does not require intervening rights, the defendants argue that both private and public intervening rights existed. However, Charter failed to identify any intervening rights during discovery. As a result, on October 8, 2008, this Court GRANTED IN PART Katz's motion to strike those arguments.
Accordingly, this Court finds that Charter has failed to provide substantial evidence of intervening rights and GRANTS Katz's motion for summary judgment as it relates to Charter's affirmative defense of prosecution laches.

V. SUMMARY

A. Charter's Motion for Summary Judgment

1. Invalidity
This Court GRANTS Charter's motion as to invalidity with respect to claim 5 of *1114 the '223 patent. Claim 5 is indefinite because the specification fails to disclose any algorithm that corresponds to the "individually cueing means" limitation.
In earlier rulings, this Court struck Charter's other indefiniteness arguments. As a result, this Court does not reach the merits of these arguments.

2. Non-Infringement/Infringement

a. Claims 10 and 11 of the '150 Patent
Charter raised four different non-infringement arguments with respect to claims 10 and 11 of the '150 patent. The arguments generally related to the issues of 1) multiple formats, 2) selecting and testing call data, 3) multiple port multiple format, and 4) fetching control data using call data. This Court rejected each of these arguments and DENIES Charter's motion for summary judgment of non-infringement with respect to claims 10 and 11.

b. Claim 5 of the '223 Patent
Although this Court found claim 5 invalid as indefinite, the Court ruled on Charter's non-infringement arguments. Charter raised five different non-infringement arguments with respect to claims 5 of the '223 patent. The arguments generally related to the issues of 1) means for providing identification signals, 2) signals vs. data, 3) synthesized voice signals, 4) selectively receiving calls, and 5) commonly processing operations. This Court rejected each of these arguments and DENIES Charter's motion for summary judgment of non-infringement with respect to claim 5.

c. Claim 1 of the '285 Patent
Charter raised four different non-infringement arguments with respect to claim 1 of the '285 patent. The arguments generally related to the issues of 1) multiple port multiple format, 2) interconnect switch means, 3) selection means, and 4) multiple formats. This Court rejected each of these arguments and DENIES Charter's motion for summary judgment of non-infringement with respect to claim 1.

d. Claim 2 of the '415 Patent
Charter raised two different non-infringement arguments with respect to claim 2 of the '415 patent. The arguments generally related to the issues of 1) associated telephone number signals, and 2) testing to determine the acceptability of calls. This Court rejected each of these arguments and DENIES Charter's motion for summary judgment of non-infringement with respect to claim 2.

e. Claim 129 of the '707 Patent
Charter raised four different non-infringement arguments with respect to claim 129 of the '707 patent. The arguments generally related to the issues of 1) a voice generator, 2) negative file data, 3) means for processing, and 4) means for providing and receiving. This Court rejected each of these arguments and DNIES Charter's motion for summary judgment of non-infringement with respect to claim 129.

f. Claims 30, 45 and 67 of the '762 Patent
Charter raised five different non-infringement arguments with respect to claims 30, 45 and 67 of the '762 patent. The arguments generally related to the issues of 1) an acknowledgment number, 2) a credit verification structure, 3) synthesized voice, 4) a central processing station, and 5) means to provide answer data signals. This Court rejected each of these arguments and DENIES Charter's motion for summary judgment of non-infringement with respect to claims 30, 45 and 67.

g. Sufficiency of Evidence
Charter claims that Katz has not presented evidence that Charter actually performed the steps for the recited method *1115 claims. This Court finds that Katz has presented sufficient circumstantial evidence to survive summary judgment. Accordingly, this Court DENIES Charter's motion for summary judgment on this issue.

h. Means Plus Function Limitations
Charter asks for findings of non-infringement with respect to various claims containing means plus function limitations. These arguments are simply the same § 112 arguments that the Court struck from Charter's motion. As a result, this Court will not address those arguments.

3. Laches
Charter also moved for summary judgment on the issue of laches. This Court's ruling on this issue is found below in section V.B.3.

4. Damages

a. Date
This Court GRANTS Charter's motion and finds that Katz may not recover damages for any activity after the expiration of the latest asserted patentsDecember 20, 2005.

b. Non-Accused System
This Court GRANTS Charter's motion for summary judgment and finds that Katz may not recover damages for any infringement by any non-CSS service.

B. Katz's Motion for Summary Judgment

1. Infringement
Katz moved for summary judgment of infringement of claims 10 and 11. This request required the Court to rule on four separate issues. First, this Court finds that using DNIS to make a selection satisfies the "under control of said [call] data signals" portion of claim 10 of the '150 patent. Second, this Court also finds that using the ANI blocking table satisfies the "fetching control data" limitation of claim 11 of the '150 patent. Nonetheless, this Court DENIES Katz's motion because it found factual disputes related to the issues of 1) multiple formats, and 2) multiple port, multiple format.

2. Equitable Estoppel
This Court GRANTS Katz's motion for summary judgment as to the defendants' affirmative defense of equitable estoppel because Charter has failed to offer substantial evidence of misleading conduct.

3. Laches
This Court finds that Katz has raised a triable issue of fact with respect to whether it unreasonably delayed in filing suit. As a result, this Court DENIES Charter's motion for summary judgment on laches.
This Court GRANTS Katz's motion for summary judgment as to Charter's affirmative defense of laches because Charter has failed to offer substantial evidence of either evidentiary or economic prejudice.

4. Prosecution Laches
This Court finds that intervening rights is a required element of the prosecution laches defense. Since Charter has failed to offer substantial and admissible evidence of intervening rights, the Court GRANTS Katz's motion for summary judgment as it relates to Charter's affirmative defense of prosecution laches.
IT IS SO ORDERED.
NOTES
[1] The remainder of Katz's motion for summary judgment concerns various defendants' affirmative defenses and is addressed at the end of this decision.
[2] During the summary judgment briefing, Katz also argued that "Do I Owe," "Special Call Types," and "Tech Check-In" also constituted separate formats. Because Katz never disclosed these contentions during discovery, this Court struck these arguments in an order dated September 30, 2008.
[3] The limitation is actually found in independent claim 96.
[4] Independent claims 17 and 41 contain common limitations that are the subject of Charter's motion.
[5] In the future, Charter may wish to be more selective in advancing it arguments. Charter's shotgun approach is not helpful and adversely affects its credibility. Moreover, "judges are not like pigs, hunting for truffles buried in briefs." U.S. v. Dunkel, 927 F.2d 955, 956 (7th Cir.1991) (per curiam). A conclusion followed by citations in support of the third argument of one of five limitations in dispute, from the seventh set of claims in dispute is unlikely to be persuasive.
[6] In its reply brief, Charter asserts that some document shows that there were no numbers in the ANI Block table of the Louisville Call Center. However, even if Charter had identified the specific document, the jury would still have to determine if it believed that the ANI Block was never used.
[7] Citing to Teradyne, Inc. v. Hewlett-Packard Co., 1994 WL 327213 (N.D.Cal. June 24, 1994), Charter argues that the presumption should apply to the '415 and '223 patents because they claim priority from earlier substantially similar patents. However, the Court finds the unreported Teradyne decision regarding reissue claims to be inapposite. Otherwise, the defendants provide no authority for their novel proposition and this Court declines to find that the laches period for the '415 and '223 patents began before they issued.